ALBRO S. HALLETT, PLAINTIFF-RESPONDENT, v. WM. EISENBERG & SONS, INCORPORATED, A BODY CORPO-RATE, DEFENDANT-APPELLANT.

Argued October 21, 1935—Decided January 31, 1936.

For the appellant, *Cox & Walburg* (*Harry E. Walburg*, of counsel).

For the respondent, *Harry Phillipson*.

The opinion of the court was delivered by

HEHER, J.   On September 11th, 1932, at the hour of three in the morning, there was a head-on collision between an automobile driven by plaintiff and a like vehicle operated by one Kasper, on the main route of the state highway system

extending through the township of Plainsboro, in the county of Middlesex, at a point where an underpass was in process of construction by the Rockefeller Institute, the owner of lands abutting upon the highway; and this action was brought to recover the resulting damage from the contractor employed to do the construction work. A permit for the construction of the underpass, and the necessary incidental obstruction of the highway, was issued by the state highway commission on May 9th, 1932. The gravamen of the complaint was the defendant contractor's asserted negligence in the setting up of barriers and obstructions upon the highway without adequate lighting and warning devices, and in not "properly defining and distinguishing the respective north and southbound traffic lanes." The jury determined the issues in favor of the plaintiff; and from the consequent judgment defendant appeals.

The first and primary insistence of appellant is that there was error in the denial of the motions to nonsuit and direct a verdict in its favor for the following stated reasons, viz.: (1) There was no proof of negligence by defendant; (2) if so, it was not the proximate cause of the collision; (3) plaintiff was guilty of contributory neligence; and (4) he assumed the risk of injury "arising out of and incidental to the use of the highway under the conditions and circumstances then and there existing."

These motions were rightly denied. This is the state's principal vehicular highway. It runs north and south, and carries the bulk of interstate traffic. The *locus* consisted of a concrete surface twenty-nine feet wide, with a gravel shoulder on either side. The width of the easterly shoulder was between ten and twelve feet. The concrete's surface was divided into three traffic lanes by well-defined white separation lines. A barricade, composed of heavy beams with a picket fence thereon, extending from the westerly side of the road almost to the easterly concrete traffic lane, closed this portion of the roadway to traffic for a distance of approximately two hundred and fifty feet. The upper rail was painted in alternate black and white lines along the entire length thereof. The southerly end bore gradually to the westerly side of the roadway. About

fifty feet to the south of the point where this fence turned toward the west, there was another barrier covering the center concrete lane and a small portion of the easterly lane. One of the defendant's witnesses testified that the unobstructed portion of the easterly lane was approximately eight and one-half feet. This barricade likewise consisted of heavy beams resting upon the roadway, with a picket fence above; and there was evidence that it was not painted with black and white alternate lines, or checkerboard squares, as required by section 42 of the Traffic act. *Pamph. L.* 1928, *pp.* 721, 757.

Lighted lanterns, with red globes, were placed on the beams of the barrier on the west side of the road, about fifteen or twenty feet apart, while bomb flare lights, the same distance apart, were placed on the line dividing the easterly concrete lane from the shoulder. These flare lights were apparently designed to serve as a line of separation between the temporary north-bound and south-bound traffic lanes. To the north of the barrier located on the west side of the road, immediately to the east of the easterly concrete lane, there was a sign post bearing the inscription "Keep Right;" and this, with an appropriate arrow, diverted traffic moving south to the easterly concrete lane. To the south of the second barrier, in the center of the highway, was a like sign and arrow, directing traffic moving north to proceed on the right thereof. The plan was to move south-going traffic through the easterly concrete lane along the barrier to the westerly traffic lane, passing the second barrier on the west, and to divert north-bound traffic to the easterly gravel shoulder; and the crucial inquiry is whether the means employed were adequate to effectuate this purpose, or fell short of the requirements of reasonable care for the safety of those operating motor vehicles upon the highway.

This is respondent's version of the circumstances attending the collision: He observed the direction of the sign post at the northerly end of the westerly barrier, and proceeded along the easterly concrete lane. He continued in a straight course, along that lane, until he observed the barrier in the center lane, which had one flare light six or eight inches from the easterly end. There was no sign or arrow directing him to

bear to the right, and, due to the inadequate lighting, he could not find the open pathway to the westerly traffic lane. This barrier "had the appearance, in the darkness, of being entirely across the roadway; * * * the appearance of closing off the entire roadway." Bewildered, he brought his vehicle to a complete stop, and, while he was endeavoring to find the pathway to the south, Kasper, heeding the direction of the sign post to the south of the barrier, passed it on the right and collided with the standing automobile. There is evidence that there were two or three additional lights at or near the southerly end of this barrier, but it is fairly inferable that they were not discernible to respondent. The flare light at the easterly end of the barrier was not of sufficient strength to pierce the darkness and outline the barrier; it apparently served to give the impression that it was the last of the row of lights on the west of the easterly concrete lane

In these circumstances, a finding of negligence in the rerouting of traffic through the construction area was justifiable. It was open to the jury to find that appellant failed in its duty to provide adequate warning, lighting and direction to guide motorists safely through the open easterly portion of the highway; and that, in consequence of deficient lighting, the southerly barrier blended into the darkness, and thus came the illusion that it stretched across the entire westerly half of the highway, and across the easterly concrete lane to the shoulder of the road. Kasper, in passing the southernmost barrier on the east, merely obeyed the injunction of the sign erected by appellant. Respondent, on the other hand, gave heed to a like posted instruction at the other end of the westerly barrier; and, in bringing his vehicle to a stop to get his bearings, he did what under the circumstances seemed to be the prudent thing. The proofs permit of the inference that his confusion and bewilderment were directly attributable to appellant's failure to properly point the course he was to take to avoid the danger of collision with traffic moving in the opposite direction; and that he was, through no fault of his own, led into a place of danger created by appellant. It could have been found that he was reasonably led to believe that the two parallel rows of lights marked out the course he

was to take—the flare light six or eight inches from the easterly side of the southerly barrier being the last of the line of lights on his right. Therefore, the jury might well have concluded, as it evidently did, that the stoppage of the car at this point denoted the exercise of due care by respondent, and, by the same token, the failure of appellant to exercise the degree of care requisite for the safety of travelers upon the highway.

It is urged that, inasmuch as "there was plenty of room for the car approaching in the opposite direction to pass by on the dirt shoulder," the collision was the proximate result of Kasper's sole negligence, and not of any failure of duty on appellant's part. The difficulty with this contention is that Kasper, in passing the barrier on the right, was observing the direction of the sign post erected by appellant. The hazard was one created by the appellant.

Nor is it of any consequence, in respect of this issue, that appellant was engaged in work incidental to the separation of the grades of these intersecting highways, under a grant of authority by the state highway commission. It was nevertheless incumbent upon it to exercise the degree of care commensurate with the risk of danger; it was not privileged to create or maintain a nuisance in the highway. *Allas* v. *Rumson,* 115 *N. J. L.* 593; *Garvey* v. *Public Service Co-ordinated Transport,* 115 *Id.* 280; 179 *Atl. Rep.* 33; *Cochran* v. *Public Service Electric Co.,* 97 *N. J. L.* 480; *Fox* v. *Wharton,* 64 *Id.* 453; *New Jersey Fidelity, &c., Insurance Co.* v. *Lehigh Valley Railroad Co.,* 92 *Id.* 467; *Public Service Railway Co.* v. *Mooney,* 99 *Id.* 58; *Gillespie Co.* v. *Cumming,* 62 *Id.* 370; *Bray* v. *West Jersey and Seashore Railroad Co.,* 98 *Id.* 148.

And, for like considerations, it was the function of the jury to assay the conduct of the respondent. The claim that it conclusively appears that he was guilty of negligence which approximately contributed to the collision is so obviously untenable as to require no discussion.

Secondly, it is maintained that there was error in the instruction that the failure of appellant to comply with the direction of section 42 of the Traffic act (*Pamph. L.* 1928, *p.* 757), imposing the obligation to mark all obstructions

upon public highways with black and white alternate lines, or checkerboard squares, of given dimensions, was a circumstance to be considered, although not conclusive of negligence. The point seems to be that the purpose of this provision is "to arrest the attention of the traveling public, and put people using the highway on their guard," and that, inasmuch as neither respondent nor Kasper collided with one of the barriers, and there was no evidence that the "obstructions were not apparent or discernible to" them, the failure to so mark the barrier was a wholly irrelevant circumstance that in no sense contributed to the collision. This claim is unsubstantial. It was for the jury to determine whether compliance with this statutory mandate would have been of material assistance in outlining the barrier to respondent, and thus permit him to find his way in safety.

Lastly, it is contended that the trial judge erred "in failing to charge and to define the legal meaning of 'proximate cause.'" No such request was interposed before the delivery of the charge. The basis for this assignment is the notation by appellant's counsel, at the conclusion of the charge, of "an exception to your honor's failure to define proximate cause to the jury." It is well settled that an exception to the failure of the court to charge a legal proposition not made the basis of a specific request is not assignable as error, and this assignment therefore lacks efficacy. *Tobish* v. *Cohen,* 110 *N. J. L.* 296; *Osbun* v. *De Young,* 99 *Id.* 204. Assuming timeliness, as relating to something the trial judge charged or omitted to charge, what was said was not cast in the form of a specific request to charge; it merely pointed out an omission that counsel conceived to be legal error, without any request for its correction. *Ceccomancino* v. *D'Onofrio,* 111 *Id.* 494.

The judgment is therefore affirmed.

*For affirmance*—THE CHANCELLOR, CHIEF JUSTICE, LLOYD, CASE, BODINE, DONGES, HEHER, PERSKIE, HETFIELD, DEAR, WELLS, WOLFSKEIL, RAFFERTY, JJ. 13.

*For reversal*—None.