233 N.J. Super. 156 (1989)
558 A.2d 474
LOUIS DEBONIS AND REBECCA DEBONIS, PLAINTIFFS-APPELLANTS,
v.
ORANGE QUARRY COMPANY, A NEW JERSEY CORPORATION; ESSEX COUNTY, NEW JERSEY; THE TOWNSHIP OF WEST ORANGE, NEW JERSEY AND H.B. MELLOTT ESTATES, INC., DEFENDANTS-RESPONDENTS, AND TRI COUNTY ASPHALT CORP., A NEW JERSEY CORPORATION, DEFENDANT.
Superior Court of New Jersey, Appellate Division.
Argued February 22, 1989.
Decided May 5, 1989.
*158 Before Judges MICHELS, MUIR, Jr. and KEEFE.
Max Spinrad argued the cause for the appellants (Miele, Cooper, Spinrad and Kronberg, attorneys).
Vincent A. Cino argued the cause for the respondent, County of Essex (H. Curtis Meanor, Acting Essex County Counsel, attorney).
William T. Connell argued the cause for the respondent, Township of West Orange (Dwyer, Connell and Lisbona, attorneys).
Kenneth P. Walsh argued the cause for the respondent, H.B. Mellott Estates (Lewis, Siegel and Wood, attorneys).
Barry S. Tolstoi argued the cause for the respondent, Orange Quarry Company (Tolstoi and Tolstoi, attorneys).
The opinion of the court was delivered by KEEFE, J.S.C. (temporarily assigned).
This case arises out of a motorcycle accident which occurred at the intersection of Eagle Rock Avenue and Mountain Avenue in West Orange. Plaintiff, Louis DeBonis, the operator of the motorcycle, sustained personal injuries. He contends that a contributing factor to the accident was the presence of a large number of small stones at, or near, the intersection and alleges that the stones came from trucks leaving defendant Orange Quarry Company (Orange Quarry). Consequently, plaintiff asserts that Orange Quarry and H.B. Mellott Estates, Inc. (Mellott), the company that allegedly crushed and helped load the stones, deviated from a standard of care applicable to them pursuant to N.J.S.A. 39:4-77 or, in the alternative, breached a *159 common law duty of care. Plaintiff further alleges that defendant Essex County (Essex), the owner of the roadway, was liable under N.J.S.A. 59:4-2 because a dangerous condition existed at the intersection, of which Essex had notice. Finally, plaintiff contends that defendant Township of West Orange (West Orange), although not the owner of the roadway, had notice of the condition and, thus, had a duty to take immediate and temporary action until Essex could act.[1]
After extensive discovery was taken, all defendants moved for summary judgment. The motions were granted as to all defendants. Plaintiff appeals the orders for summary judgment entered on behalf of Essex, Orange Quarry, Mellott and West Orange.[2]
Summary judgments must be granted if "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." R. 4:46-2. All inferences or doubts are to be drawn against the movant and in favor of the opponent of the motion. Judson v. Peoples Bank & Trust Co., of Westfield, 17 N.J. 67, 75 (1954). A motion for summary judgment concedes, for the purposes of the motion, the truth of the plaintiff's evidence. Betancourt v. Gaylor, 136 N.J. Super. 69, 72 (Law. Div. 1975). In reviewing whether the trial judge was correct in granting summary judgment, the appellate court's inquiry is whether there was a genuine issue of material fact and, if not, whether the motion judge's ruling on the law was correct. Vallillo v. Muskin Corp., 218 N.J. Super. 472, 474-475 (App.Div. 1987), *160 certif. den. 109 N.J. 496 (1987). Considered in a light most favorable to the plaintiff, we now set forth the relevant evidence in the record before us.
On September 7, 1984, shortly before 3:45 p.m., plaintiff left his place of employment on Washington Street, West Orange, operating a motorcycle owned by a friend. He proceeded west on Eagle Rock Avenue followed by another friend who was 20 to 25 feet behind him. Plaintiff and his friend passed an automobile driven by Raymond Carlucci, who stated that the two motorcyclists were "going slow" as they passed him on the right. The approach to the intersection with Mountain Avenue constitutes an "S" curve. First there is a curve to the right, then there is a curve to the left. Plaintiff stated that he knew about the curve and that his speed was about 35 miles per hour as he approached the first curve, and the same speed as he went into the left curve. The speed limit at the location is 40 miles per hour.
Plaintiff said that, as he was going into the left curve, the car 20 feet in front of him moved slightly into his lane. In reaction, plaintiff moved two feet to his right and reduced his speed. Plaintiff then felt gravel and stones under his front wheel which started shaking and his back wheel began to skid. The motorcycle apparently hit the curb propelling plaintiff into a street sign. Plaintiff's account was substantially confirmed by Carlucci. Plaintiff's friend, who was following him, also confirmed plaintiff's account. He stated that there were large patches of stones in the vicinity of Mountain Avenue.
Samuel DeBonis, plaintiff's brother, arrived at the scene a few minutes later and observed "1000" or more stones. West Orange officer James Laing noticed "small" stones of the type excavated at Orange Quarry. He said the stones were scattered across the entire width of Washington Avenue in a configuration "like a path maybe a foot wide." The path followed the imaginary curb line of Eagle Rock Avenue as it crossed the intersection. Laing said he had observed stones *161 fall from trucks on Eagle Rock Avenue on prior occasions and had given out five or six summons as a result. He said he had also observed trucks on prior occasions exiting the Quarry with stones mounded over the sidewalls or rear gates. Laing further testified that some amount of stones or rocks were always present. However, when he "deemed it to be a situation that was unsafe ..." some notification was given to Orange Quarry.
A number of individuals, not directly involved in the accident but familiar with the condition of the intersection, were either deposed or gave statements. Ruth Stefel said that she was on Eagle Rock Avenue at 10:30 a.m. on the date of the accident and observed "the grey gravel rocks but large ones. There's always some on the road but that day they were very bad." She recalled that the stones were on the road "for a quarter of a mile in either direction. It was loaded with stones like there had been a big spill...." She observed such a spill on the road "once every six months." Marie Gordon also drove through the intersection on the morning of the accident at about 8:15 to 8:30 a.m. and said that there appeared to be more than the usual amount of stones on the road. She said the wheels on her car "kind of shimmied" when she rode over them. Similar testimony was given by Judith Gibbons and Martin Tobia. Anthony Barbara and Robert Shiel testified that they saw employees of the quarry sweeping rocks and stones from the street on various occasions.
Robert Turlington, Director of the Essex County Division of Road and Bridges, testified that Eagle Rock Avenue is a county road for its entire length, and that he received five or six complaints from people about rocks and gravel on the road, including the intersection in question. The complaints were prior to the accident, but he could not recall the exact dates. The West Orange police had also called, prior to the date of the accident, reporting the spillage of stone and gravel on the road. When the county was notified, perhaps at a minimum of once a month, it swept Eagle Rock Avenue.
*162 Robert Pozzi, vice president of Orange Quarry, stated that the loading of vehicles at the quarry was done by employees of Orange Quarry and H.B. Mellott. H.B. Mellott was the contractor and did the manufacturing, i.e., blasting the rock from the cliffs. After the rocks were reduced in size, the finished product went into a hopper. There were two ways of loading the trucks; from the hopper, which was done by H.B. Mellott employees, and from the stock pile, which was done by both Orange Quarry and H.B. Mellott employees. The truckers were not permitted to do any of the loading. Pozzi said a cover for the trucks was required only if the load was above the body of the truck. Orange Quarry had a sign at the exit which said, "NO STONE SPILLING," or words to that effect. He had men sweep rocks "almost every day" from in front of the entrance way. Pozzi further stated that he received complaints from the police at the rate of once a month about spilling and "maybe once a year" from the public.
Plaintiff's engineering expert, John Lacz, submitted a report which concluded that the accident was caused by the stones on the road, the failure to clear the stones from the road and poor maintenance of the pavement by the county and the township. He stated that the stones served as "small roller bearings" which would cause a cyclist to lose traction. When deposed, Lacz was asked whether Essex County utilized reasonable measures to maintain the roadway. Lacz replied that he didn't have enough information to make that judgment.

LIABILITY AS TO ORANGE QUARRY AND H.B. MELLOTT
Plaintiff argues that Orange Quarry and Mellott deviated from the standard of care applicable to them by N.J.S.A. 39:4-77, and that such deviation was the proximate cause of his injuries. The trial judge held that the statute does not apply. We agree.
N.J.S.A. 39:4-77 provides:

*163 No person shall cause or permit a vehicle to be loaded or operate a vehicle so loaded that the contents or any part thereof may be scattered in any street. Whenever the load of any vehicle is of material other than farm products susceptible to scattering on a street and such load extends above the height of the sides or tailgate or rear of the body of the vehicle, such load shall be securely covered by a tarpaulin or other cover. The director, where public safety so warrants, shall, after a public hearing, prescribe by rule or regulation minimum safety standards for fastening loads on and fix loading procedures for any commercial type flat bed motor vehicle or motor-drawn vehicle. Any rule or regulation so promulgated by the director shall be filed in the Secretary of State's office and copies thereof shall be available, upon request, in the director's office.
The owner, lessee, bailee, or operator of any vehicle described above found on a highway in violation of any such safety standard or procedure that may be prescribed by the director shall be fined not more than $500.00 for each violation.
Plaintiff contends that the statute applies to both loaders and operators. In support of his argument, he cites the first sentence of the statute which states: "No person shall cause or permit a vehicle to be so loaded...." (emphasis added). However, the second paragraph of the statute prescribes penalties for the "owner, lessee, bailee, or operator of any vehicle" described therein. This latter provision makes it clear that the class of persons to whom the penalty applies are those who have "control" over the vehicle, not those whose sole involvement is loading the vehicle. Thus, the second paragraph of the statute identifies the class of people which the statute seeks to regulate and thereby limits the general phrase "no person" used in the first sentence.
Plaintiff also argues that the provision of N.J.S.A. 39:4-1, which states that the chapter shall apply to "owners and drivers of vehicles subject to such specific exceptions as are set forth in this chapter," provides support for his position because the use of the words "no person" in the first sentence of N.J.S.A. 39:4-77 creates an exception. We disagree. The "exceptions" mentioned in N.J.S.A. 39:4-1 refer to persons, other than owners and drivers, to whom the chapter also specifically applies, such as bicyclists and pedestrians. N.J.S.A. 39:4-14.1; N.J.S.A. 39:4-32 et seq.
*164 Plaintiff also contends that the penalty provision set forth in the second paragraph of N.J.S.A. 39:4-77 refers to only part of the preceding paragraph which proscribes violation of the minimum safety standards promulgated by the director and not to the part of the paragraph which proscribes overloading and spilling. To accept plaintiff's position, we would have to conclude that the Legislature intended to penalize a violation of the safety standard but not overloading or spillage. Such a result would be illogical. A statutory interpretation which leads to an absurd or unreasonable result is to be avoided. Davis v. Heil, 132 N.J. Super. 283, 293 (App.Div. 1975), aff'd o.b., 68 N.J. 423 (1975).
In the alternative, plaintiff argues that Orange Quarry and Mellott were negligent for the breach of a duty owed at common law. Plaintiff asserts that it would be reasonable for a jury to conclude that Orange Quarry and Mellott negligently loaded the trucks permitting the stones to spill onto the roadway and that the improper loading of the vehicles was a proximate cause of the accident.
Duty involves the concept of foreseeability, that is, whether a reasonably prudent person should have anticipated that injury to the plaintiff, or to those in a like situation, would probably result. Hill v. Yaskin, 75 N.J. 139, 144 (1977). A legal duty arises to take some action if harm to another is reasonably foreseeable in the event that it is not taken, or to refrain from taking some action if harm to another is reasonably foreseeable in the event it is taken. Foreign Auto Prep. Serv. Inc. v. Vicon Constr. Co., 193 N.J. Super. 420, 423 (App.Div. 1984). It is reasonably foreseeable under the circumstances of this case that trucks leaving the quarry overloaded or not secure would cause spillage and pose a threat of injury to plaintiff and others similarly situated. Thus, we hold that Orange Quarry and Mellott had a duty to load the trucks in such a manner that they were not overloaded and the load was secure.
*165 It is well-settled in New Jersey that one who negligently places or maintains in or near a highway anything which will render the way unsafe for travel is liable to anyone injured by such conduct. See, Hallet v. Wm. Eisenberg & Sons, Inc., 116 N.J.L. 201 (E. & A. 1935); Volinsky v. Public Service Coordinated Transport, 5 N.J. Super. 320 (App.Div. 1949) certif. den. 3 N.J. 515 (1950); Knapp v. Phillips Petroleum Co., 123 N.J. Super. 26 (App.Div. 1973); Westchester Fire Ins. Co. v. Continental Ins. Co., 126 N.J. Super. 29, 39 (App.Div. 1973) aff'd 65 N.J. 152 (1974). More factually on point is the case of Birmingham Slag Div. of Vulcan Mat. Co. v. Chandler, 45 Ala. App. 406, 231 So.2d 329 (1970). There, plaintiff alleged that defendant, who was in the business of selling slag which was hauled from its premises over the public roads, negligently overloaded the trucks so that the slag fell off in large quantities at a particular intersection, causing a hazardous condition to the users of the highway. The evidence disclosed that slag had fallen from trucks loaded at defendant's plant near the scene of the accident for a long period of time. The court found that defendant knew, or should have known, that such spillage was occurring and that it was due, at least in part, to the overloading of the trucks. Based on those facts, the court upheld the verdict in favor of plaintiff.
The next question to be decided is whether there was sufficient evidence to prove that Orange Quarry and Mellott breached that duty. We are mindful that this case was decided by summary judgment. All inferences or doubts are drawn in favor of the party opposing the motion. Judson v. Peoples Bank & Trust Co. of Westfield, supra, 17 N.J. at 75. It is conceivable that there was some other cause for the spillage not related to defendant's conduct, such as a defect in the vehicle permitting spillage or the unsafe operation of the vehicle. However, in light of the frequency of the occurrences described by the witnesses, it would not be unreasonable to infer that the trucks were improperly loaded. Thus, we conclude *166 that the trial court was in error when it granted Mellott's and Orange Quarry's motion for summary judgment.

LIABILITY AS TO ESSEX COUNTY
Plaintiff alleged with respect to Essex County that it is liable for a dangerous condition of public property, relying upon N.J.S.A. 59:4-2. This statute in pertinent part provides:
A public entity is liable for injury caused by a condition of its property if the plaintiff establishes that the property was in dangerous condition at the time of the injury, that the injury was proximately caused by the dangerous condition, that the dangerous condition created a reasonably forseeable risk of the kind of injury which was incurred, and that ...
b. a public entity had actual or constructive notice of the dangerous condition under § 59:4-3 a sufficient time prior to the injury to have taken measures to protect against the dangerous condition.
Nothing in this section shall be construed to impose liability upon a public entity for a dangerous condition of its public property if the action the entity took to protect against the condition or the failure to take such action was not palpably unreasonable.
In order for a plaintiff to recover under this statute there must be proof that, 1) a dangerous condition existed on the entity's property at the time of the injury, 2) the dangerous condition proximately caused the injury, 3) the dangerous condition created a forseeable risk of the kind of injury incurred, 4) the public entity had actual or constructive notice of the dangerous condition which caused plaintiff's injury in sufficient time prior to the injury to correct it, and 5) the action or inaction of the public entity with respect to its effort to protect against the condition was palpably unreasonable. Thompson v. Newark Housing Authority, 108 N.J. 525, 530 (1987).
N.J.S.A. 59:4-1a defines "dangerous condition" of public property as follows:
"Dangerous condition" means a condition of property that creates a substantial risk of injury when such property is used with due care in a manner in which it is reasonably forseeable that it will be used.
Not every defect in a highway, even if caused by negligent maintenance, is actionable. Polyard v. Terry, 160 N.J. Super. 497, 508 (App.Div. 1978), aff'd o.b. 79 N.J. 547 (1979). N.J.S.A. 59:4-1 requires that the defect create a "substantial risk of *167 injury" when the highway is used with due care "in the manner which it is reasonably forseeable that it will be used." The use of the phrase "substantial risk" is understood to mean a risk that is not minor, trivial or insignificant. Id. 160 N.J. Super. at 509. The question of whether a dangerous condition exists must be examined by the court to determine if the particular highway irregularities were such that reasonable minds could differ as to whether they manifested that the highway was in a dangerous condition. Id. at 510.
It is clear in this case that the plaintiff was using the public roadway in a reasonably foreseeable manner and with sufficient "due care" to comply with the statute. See, Speziale v. Newark Housing Auth., 193 N.J. Super. 413, 418-419 (App. Div. 1984). The trial judge, apparently believing that the condition of the roadway on the date of the accident did not create a substantial risk of injury to operators of cars or trucks, refused to "carve out a definition of dangerous condition" for motorcycles. In this, we feel the judge erred. Several cases have considered the substantiality of the risk of injury in the context of the status of the person who is injured, so long as the use of the public property was both permitted and forseeable. Fox v. Tp. of Parsippany-Troy-Hills, 199 N.J. Super. 82 (App.Div. 1985) and Morris v. Clinton Tp., 225 N.J. Super. 58 (App.Div. 1988) (both cases addressed the question in the context of the plaintiff as the operator of a motorcycle). In our view, the presence of the quarry stone on the roadway, acting as "small roller bearings" with the capacity to cause the operator of a motorcycle to lose control, is sufficient proof that the condition is dangerous.
However, the issue which sustains the judgment in favor of Essex County is the one of notice. N.J.S.A. 59:4-3 states:
a. A public entity shall be deemed to have actual notice of a dangerous condition within the meaning of subsection b. of section 59:4-2 if it had actual knowledge of the existence of the condition and knew or should have known of its dangerous character.
b. A public entity shall be deemed to have constructive notice of a dangerous condition within the meaning of subsection b. of section 59:4-2 only if the *168 plaintiff establishes that the condition had existed for such a period of time and was of such an obvious nature that the public entity, in the exercise of due care, should have discovered the condition and its dangerous character.
Plaintiff does not contend that there was actual notice of the condition. However, he argues that there was constructive notice of it and relies on two cases in furtherance of his argument, McGowan v. Borough of Eatontown, 151 N.J. Super. 440 (App.Div. 1977) and Milacci v. Mato Realty Co., Inc., 217 N.J. Super. 297 (App.Div. 1987).
Both cases are distinguishable on their facts from the case under review. "Cases state principles but decide facts, and it is only the decision on the facts that is binding precedent." Feldman v. Lederle Laboratories, 97 N.J. 429, 455 (1984) quoting from Konrad v. Anheuser-Busch, Inc., 48 N.J. Super. 386, 388 (Law. Div. 1958). In McGowan plaintiff alleged that water accumulated on the highway because of improper drainage and formed into ice causing him to lose control of his vehicle and crash. Testimony from a police officer established that the State had been notified of icy conditions on a number of occasions and that the condition would occur whenever the road was wet and cold enough to freeze. Summary judgment entered for the State was reversed on appeal. We reasoned that the facts presented created a legitimate inference of constructive notice in that "the condition would re-occur under predictable circumstances," thereby giving the State sufficient time to correct the defect which permitted it to occur. 151 N.J. Super. at 448.
In Milacci, plaintiff fell on an accumulation of sand and dirt on the floor in the State unemployment office. Summary judgment was granted to the State on the issue of notice. We reversed. The essence of our reason for reversal was the nature of the hazard and the fact that it occurred in a public building where State employees were always present during business hours. We said:
Their description of the condition as an "accumulation of sand and dirt" indicates prima facie that the condition existed for some period of time. From this a jury might reasonably infer that the time involved was sufficient for the *169 State and the custodial service to have discovered the condition. See Zizi v. Gabriele D'Annunzio Lodge No. 22, 14 N.J. Super. 200, 204 (App.Div. 1951) (where plaintiff fell after stepping on slippery refuse on stairs, inferred time lapse of 45 minutes between littering of stairs and consequential fall may create a jury question of notice if it is established that defendant or defendant's employees are frequently or continuously about the place where the condition exists and thus have greater reason and opportunity to detect and remedy it before injury to patron)
217 N.J. Super. at 302-303.
Other cases, not cited by plaintiff, also have tangentially addressed the notice issue. In Speaks v. Jersey City Housing Auth., 193 N.J. Super. 405 (App.Div. 1984) certif. den. 97 N.J. 655 (1984), the plaintiff was injured when he was struck by a bicycle frame thrown out of a stairwell window while he was playing in the yard below. The bicycle ordinarily would not have fit through the opening but for the fact that the window frame had been removed. The public entity was aware that it had been missing for two weeks or longer and had received complaints concerning the hurling or dropping of objects from windows. Thus, constructive notice of the condition existing on the date of accident was inferable. In Wooley v. Bd. of Chosen Freeholders, 218 N.J. Super. 56 (App.Div. 1987) plaintiff was injured when her car crashed through a wooden guard rail and fell into a 20 foot ravine. Plaintiff claimed that the wooden barrier was ineffective and created a dangerous condition. There was evidence that the county was aware of the inadequacy of such guard rails. Since the opinion focused on other issues, it can reasonably be implied that the plaintiff had sufficiently proven constructive notice to the county. See also, Fox v. Tp. of Parsippany-Troy-Hills, supra. and Morris v. Clinton Tp., supra.
The Speaks, Wooley, Fox and Morris cases all involve fixed conditions of public buildings or public highways which were alleged to be dangerous. Because of the fixed nature of the condition, it was reasonably inferable that the public entity had constructive notice of the condition both at the time of plaintiff's *170 accident and at a sufficient time before the accident to have corrected the condition.
McGowan is unlike those cases in that the allegedly dangerous condition was not fixed, but, rather, dynamic or changing. However, although the condition did not always exist, it was reasonable to infer constructive knowledge of the condition on the date of plaintiff's accident since the condition was "predictably recurrent" and, thus, the State had sufficient opportunity beforehand to correct it. The same rational applies to the Milacci case. The condition of the building was not a fixed one but, because of the constant presence of State employees within the building, it was reasonable to infer that the State should have known of the condition within sufficient time to correct it.
The facts of the case under consideration are somewhat unique. The most favorable inference to be drawn in favor of plaintiff is that Essex was aware that on some occasions stones from the quarry would find their way onto the road surface and, at times though not always, would create a dangerous condition. That general knowledge cannot be used to impute constructive knowledge of the condition on the date of plaintiff's accident because the condition changed from day to day and was not "predictably recurrent" as in McGowan.
We are obliged to interpret the Tort Claims Act in accordance with the legislative policy concerning liability for conditions of public property. The comment to N.J.S.A. 59:2-1 states, in part, "[i]t is anticipated that the courts will realistically interpret both the statutory and common-law immunities in order to effectuate their intended scope." The comment to N.J.S.A. 59:4-2, in part, says: "[t]his section recognizes the difficulties inherent in a public entity's responsibility for maintaining its vast amounts of public property."
Plaintiff's brother testified that on a day before the accident there were stones on the road but "not like they were on the day of the accident." On the day of the accident there appeared to have been a spillage and it was "dramatically" *171 different. The testimony of the other witnesses was similar. There was no evidence from which a jury could infer that the dangerous condition which existed on the date of plaintiff's accident was present on the day before the accident. On this record we deem it unreasonable and beyond the legislative intent to allow a jury to infer constructive notice on the part of Essex. Because the problem was not predictably recurrent, Essex had no realistic way to correct it, except to order continuous inspections of the loading practices followed at the quarry. However in that respect, no liability can be imposed for its failure to do so. Kenney v. Scientific Inc., 204 N.J. Super. 228 (Law. Div. 1985).

LIABILITY OF THE TOWNSHIP OF WEST ORANGE
Plaintiff argues that the Township of West Orange is liable under N.J.S.A. 59:4-4 for not abating the condition or failing to provide warning of dangerous road conditions even though the road was not owned or controlled by it. West Orange replies that because it did not own, maintain or control the roadway in question, it is immune from liability under the Tort Claims Act. In any event, West Orange contends that plaintiff has failed to prove that it had actual notice of the condition which caused plaintiff's accident. The trial judge construed the statute so as to require proof of actual notice of the dangerous condition to the public entity, where the public entity is not the owner of the property. We agree.
N.J.S.A. 59:4-4 states:
Subject to section 59:4-4 of this Act, a public entity shall be liable for injury proximately caused by its failure to provide emergency signals, signs, markings or other devices if such devices were necessary to warn of a dangerous condition which endangered the safe movement of traffic and which would not be reasonably apparent to, and would not have been anticipated by, a person exercising due care.
It is not clear from the statute whether the Legislature intended to impose liability on a public entity that does not own the property on which the dangerous condition exists and which gives rise to the circumstances requiring the use of emergency *172 signals. However, the legislative comment to the statute refers to the case of Bergen v. Koppenal, 52 N.J. 478 (1968), decided before the Tort Claims Act was enacted. In Bergen, a township police officer noted that an overhead traffic light had broken loose and had turned so that its signal was misdirected. The road in question was a State highway, and the lighting system was maintained by the State. The police officer advised his headquarters of the condition but the State highway department could not be reached until 8:00 a.m., approximately two hours after the officer's observation. A car accident occurred at 8:45 a.m., allegedly caused in part by the misdirected traffic signal. The plaintiff sued the driver of the other car and the township. The Supreme Court affirmed our reversal of the judgment in favor of the township. However, the Court limited its holding, stating that "a duty may be found if a police officer learns of an emergent condition which is likely not to be observed by a motorist and which holds an unusual risk of injury." Id. at 480. Thus, liability was found for failing to warn about the dangerous condition of the property of another only where actual notice of the condition was proven.
This rationale was followed in Meta v. Tp. of Cherry Hill, 152 N.J. Super. 228 (App.Div. 1977), certif. den. 75 N.J. 587 (1977) where a motorist involved in a head-on collision on a county road alleged that the township and county were negligent in failing to either alleviate a dangerous ice patch or alert motorists of its existence. We reversed a summary judgment in favor of the defendants and specifically noted that the township police officer believed the condition constituted an emergent road condition not likely to be observed by a motorist and for that reason had notified both the county and municipalities several times. Id. 152 N.J. Super. at 234.
In the present case, there is no evidence that Officer Laing or Officer Guarino had actual notice of the specific condition which caused plaintiff's accident prior to its occurrence.
*173 In conclusion we affirm the entry of summary judgment in favor of the County of Essex and the Township of West Orange and reverse summary judgment entered in favor of defendants Orange Quarry Company and H.B. Mellott Estates, Inc.
NOTES
[1] Orange Quarry commenced a third party action against some 90 additional parties. On June 12, 1987, an order was entered severing the third party complaint from the direct action.
[2] Tri-County Asphalt was also a named defendant. Summary judgment was granted in its favor. However, plaintiff does not appeal from that order.