766 A.2d 1168 (2001)
337 N.J. Super. 259
STATE of New Jersey, Plaintiff-Respondent,
v.
Yusef ALLEN, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued January 9, 2001.
Decided February 14, 2001.
*1169 John A. Young, Jr., argued the cause for appellant (Willis & Young, attorneys).
Steven J. Kaflowitz, Assistant Union County Prosecutor, argued the cause for respondent (Thomas V. Manahan, Union County Prosecutor, attorney; Mr. Kaflowitz, of counsel).
Before Judges STERN, A.A. RODRIGUEZ and FALL.
The opinion of the court was delivered by STERN, P.J.A.D.
Defendant was convicted of murder, N.J.S.A. 2C:11-3a(1) and/or (2) (count *1170 one), possession of a firearm for an unlawful purpose, N.J.S.A. 2C:39-4a (count two), and possession of a firearm without a permit, N.J.S.A. 2C:39-5b (count three). Count two was merged into count one for purposes of sentencing, and defendant was sentenced for the murder, to a term of life imprisonment, with 85% of seventy-five years to be served without parole eligibility, under the No Early Release Act (NERA).[1] In addition, defendant was sentenced to a concurrent five year sentence for the permit violation. On this appeal, defendant argues:
POINT I THE PROSECUTOR TRANSGRESSED ALL LIMITS OF PROPRIETY THROUGHOUT THE ENTIRE TRIAL, DENYING THE DEFENDANT HIS FEDERAL AND STATE CONSTITUTIONAL RIGHT TO A FAIR TRIAL.
POINT II THE TRIAL COURT FAILED TO GRANT A JUDGMENT OF ACQUITTAL OR A MOTION FOR A NEW TRIAL; NO REASONABLE JURY COULD FIND THAT THE STATE HAD PROVEN ITS CASE BEYOND A REASONABLE DOUBT.
We also wrote to counsel and asked them to be prepared at oral argument to address the sentence on the murder conviction in light of State v. Manzie, 335 N.J.Super. 267, 762 A.2d 276 (App.Div. 2000).
Our careful review of the record leads us to conclude that the trial issues raised by defendant are clearly without merit and warrant only the following discussion. R. 2:11-3(e)(2). We therefore affirm the judgment. However, we vacate the NERA term imposed on the life sentence, and remand for imposition of a sentence of life imprisonment with thirty years before parole eligibility.

I.
On October 15, 1997 around 6:00 a.m., Ruby Waller was approached by Lannie Silver near West Third Street and Lee Place in Plainfield. Silver was looking for a location to buy drugs and was escorted by Waller to the Mack House on Prescott Place where she regularly purchased crack-cocaine.
Upon arriving at the "Mack House," Waller proceeded to a window at the front of the house and sat on a bench located in front of the window. The window shade was drawn. However, Waller placed an order for "four nickels" of crack-cocaine and slid $20 through the "cracked" portion of the window to a man she identified as "Ben."[2] After receiving the drugs that she purchased, Waller stood and moved away from the window, allowing Silver to sit on the bench.
Silver then asked Ben, "[w]hat you got," at which point Ben "pulled the shade back and looked out the window" at Silver. After seeing Silver, Ben and defendant exited the house, and Ben yelled at Silver, "get the F out of here, [we] don't sell drugs [here], white mother-f......"[3] Silver tried to retreat from the porch with his hands in the air, repeating that he "just want[ed] to buy some drugs." However, defendant and Ben followed Silver, yelling at him and using profane language. According to Waller, at one point defendant stated, "[h]old up, I got something for this mother-f....." He then entered the Mack House and returned "a second" later *1171 holding a gun "in his hand, down on the side."
Upon seeing the defendant with a gun, Waller testified that she "ran" to her residence a short distance away. As she "approached the top stairs" to the house, Waller "heard a gunshot." Once inside the house she heard "several more" shots and "hear[d] the victim screaming."
After entering her apartment, Waller testified that she looked out a window from which she could view the intersection of West Third Street and Prescott Place. She saw Silver "trying to run" but fall to the ground after "the last shot hit him." Waller further testified that Silver tried to get up but could not and finally "crawled to the middle [of Prescott Place]" before collapsing. Waller indicated that the time between the first and last shots was "like a half a second."
After witnessing the victim laying in the middle of the street, Waller saw Ben and defendant "running into the Mack office," located close to the house where she had purchased drugs earlier that morning. Waller immediately phoned 911 and reported the incident to the police.
Rhonda Whitfield, who was serving a sentence in the Middlesex Correctional Facility during the trial, testified that she was "[g]oing to buy a bag," that morning and saw the victim "on the porch" of the Mack House, "[l]ike talking to the screen." Only one person is permitted on the porch of the Mack House at a time, so Whitfield stayed on the street. As the victim was talking, defendant and "Marvin" came out of the house. Whitfield was "dope sick" and paying "no mind," but "knew something wasn't right." She started to leave the area to buy drugs elsewhere when the defendant and Marvin began "yelling" at the victim, who was "trying to walk" away. As the victim walked away, defendant was "running behind the guy," holding an object to his side. Whitfield subsequently heard what she thought were "fire-crackers."
Whitfield further testified to having been in an automobile accident subsequent to the date of the shooting and that she had experienced some memory loss due to "head trauma" suffered in the accident.[4]
Bobby Harris, a high school student, testified on defendant's behalf that, while he was walking his dog on the morning in question, he heard shots and saw that "dude about to fall." He turned around, ran home, but saw a white car "ride pas[t]."[5] The car drove past Harris about fifteen to twenty minutes later, but he did not look inside when an occupant yelled to him.
Cynthia Harrison testified for defendant that she saw the victim with a male named John Korman minutes prior to the shooting. Silver asked her "where to find cocaine," and she gave them directions to "the corner of Prescott."

II.
Defendant contends that his constitutional right to a fair trial was violated by the prosecutor when he allegedly excluded jurors based on their race and when:
(1) the prosecutor, even though notified in advance of the trial, failed to inform the defense that its witness *1172 Rhonda Whitfield had been involved in a car accident after the shooting, from which she had sustained memory loss; (2) the prosecutor, even though notified in advance of trial, did not inform the Defense that its witness Ruby Waller was going to make an identification of Mr. Allen, and state that she had purchased drugs from him in the past; (3) the prosecutor, even though notified in advance of trial, did not inform the defense that its witness Rhonda Whitfield would make a similar identification of Mr. Allen; (4) the prosecutor during his opening and closing arguments made outlandish comments to the jury which were unsupported by the facts in evidence, and for which the court had previously instructed him not to speak about.
Defendant also argues that the prosecutor's misconduct led defense counsel to object on "an unusually high number" of occasions and "resulted in prejudice to Mr. Allen" before the jury.
As has been said many times, "the primary duty of a prosecutor is not to obtain convictions, but to see that justice is done," State v. Frost, 158 N.J. 76, 83, 727 A.2d 1 (1999); State v. Ramseur, 106 N.J. 123, 320, 524 A.2d 188 (1987), and "prosecutorial misconduct can be a ground for reversal where the prosecutor's misconduct was so egregious that it deprived the defendant of a fair trial." Frost, supra, 158 N.J. at 83, 727 A.2d 1; Ramseur, supra, 106 N.J. at 322, 524 A.2d 188; State v. Siciliano, 21 N.J. 249, 262, 121 A.2d 490 (1956). In reviewing the prosecutor's actions and whether the misconduct was sufficient to warrant reversal,
[A]n appellate court "must take into account the tenor of the trial and the degree of responsiveness of both counsel and the court to improprieties when they occurred." Specifically, an appellate court must consider (1) whether defense counsel made timely and proper objections to the improper remarks; (2) whether the remarks were withdrawn promptly; and (3) whether the court ordered the remarks [be] stricken from the record and instructed the jury to disregard them. Frost, supra, 158 N.J. at 83, 727 A.2d 1 (citations omitted).
A defendant's right to a fair trial endures even in the face of overwhelming evidence of his or her guilt. Id. at 87, 727 A.2d 1.
The first jury selection process was terminated when the judge perceived a violation of State v. Gilmore, 103 N.J. 508, 511 A.2d 1150 (1986). Defendant contends that:
Although his misconduct during the first jury selection was corrected with the granting of a mistrial, this act is extremely relevant as it demonstrates evidence of the prosecutor's intent, and his willingness to break the rules in order obtain a conviction.
He further contends that the necessitated "mistrial" evidences the prosecutor's "malicious intent, his ability and willingness to use unjust means to obtain a conviction, and the overall weakness of the State's case." If we so perceived the conduct at defendant's trial, reversal of the conviction would be required.
Defendant does not suggest a Gilmore violation by the prosecutor, necessitating a "mistrial," constitutes the type of misconduct prohibiting a subsequent trial. See Oregon v. Kennedy, 456 U.S. 667, 674, 102 S.Ct. 2083, 2088, 72 L.Ed.2d 416, 423-24 (1982) (prosecutorial misconduct or overreaching bars retrial when intended to "goad" defendant into moving for mistrial). Defendant cites to no case, and we have found none, in which either a Gilmore violation, or similar violation of federal law, see Batson v. Kentucky, 476 U.S. 79, 84, 106 S.Ct. 1712, 1716, 90 L.Ed.2d 69, 79 (1986), precluded a trial. See United States v. Bishop, 959 F.2d 820, 829 n. 10 (9th Cir.1992). The misconduct must infect the matter after jeopardy attaches, and jeopardy attaches when the jury is empaneled and sworn. Crist v. Bretz, 437 U.S. 28, 37-38, 98 S.Ct. 2156, 2162, 57 L.Ed.2d 24, 32-33 (1978); Serfass v. United States, 420 U.S. 377, 388, 95 S.Ct. 1055, 1062, 43 L.Ed.2d 265, 274 (1975).
*1173 While defendant now alleges that the prosecutor injected race into the trial, he points to no such claim before the trial judge, and asked the trial judge to take no action based on any perception at the time. Nor does the record suggest a basis for such a claim.[6]
Defendant also argues that the prosecutor's failure to turn over discovery material, including prior identifications by Waller and Whitfield, and the prosecutor's failure to instruct these witnesses not to give unduly prejudicial testimony that defendant sold them drugs and had a violent history, evidences his "continued intent... to obtain a conviction by any means necessary," requiring reversal. The record reflects that statements made by Ms. Waller and Ms. Whitfield were turned over to the defense prior to trial. In addition, the trial judge was careful to instruct Waller and Whitfield not to testify that they had allegedly purchased narcotics from the defendant, notwithstanding the events surrounding the shooting, or that he may have had a violent history. We find nothing in the record to support a claim that the prosecutor knew such statements were going to be made or that he encouraged the witnesses to disregard the judge's instructions. Further, the judge struck the comments he deemed to violate his order immediately following their mention and instructed the jury to disregard them. See Frost, supra, 158 N.J. at 83, 727 A.2d 1. We add that the testimony regarding the victim being taken to the "Mack House" by Waller for purposes of buying drugs, and that he tried to buy drugs before the confrontation, was a necessary part of the State's case with respect to an explanation for the crime or its motive. We find no unduly prejudicial testimony beyond what was necessary in that regard.
The trial court concluded that the prosecutor's failure to turn over the medical and hospital reports of Ms. Whitfield, showing the head trauma and injuries caused by her accident, may have amounted to a Brady violation.[7] However, after the jury was charged, the prosecutor introduced an investigator to develop, outside the presence of the jury, that Whitfield never revealed there was an accident resulting in any memory loss on the witness's part, although she revealed that she had hit her head. In any event, the information about Ms. Whitfield's automobile accident and injuries were developed before the jury and the defense was provided the opportunity to question her in detail with respect thereto, in an effort to discredit her testimony. Furthermore, after learning of the undisclosed head injury, the trial judge offered the defendant a mistrial and he declined, wishing instead to continue with the proceeding. Finally, the prosecutor insists, without contest, that Ms. Whitfield's trial testimony was consistent with her pre-accident statement, and the witness indicated the same. We cannot therefore conclude that any discovery violation or failure to produce evidence relevant to the witness's credibility, deprived defendant of a fair trial or undermined our confidence in the outcome. See United States v. Bagley, 473 U.S. 667, 675-76, 105 S.Ct. 3375, 3379-80, 87 L. Ed.2d 481, 489-90 (1985).

III.
Defendant contends that the trial court erred when it denied his motion for a *1174 judgment of acquittal. More specifically, defendant argues that no reasonable jury could have returned a guilty verdict against him based on the evidence presented by the State. In reviewing the claim, we must decide only if:
viewing the State's evidence in its entirety, be that evidence direct or circumstantial, and giving the State the benefit of all its favorable testimony as well as all of the favorable inferences which reasonably could be drawn therefrom, a reasonable jury could find guilt of the charge beyond a reasonable doubt.
[State v. Brown, 80 N.J. 587, 591, 404 A.2d 1111 (1979) (citing State v. Reyes, 50 N.J. 454, 458-59, 236 A.2d 385 (1967)).]
See also State v. Kittrell, 145 N.J. 112, 130, 678 A.2d 209 (1996) (applying similar standard to appellate review).
Applying that standard, we find no basis to upset the judgment. The State presented witnesses who saw defendant at the scene arguing with the victim, at least one of whom saw him with a weapon, and another who heard what sounded like gunshots shortly after leaving the scene. Taking this into account and "giving the state the benefit of all favorable testimony as well as all of the favorable inferences which could be drawn therefrom," a reasonable jury could find that defendant shot Silver.

IV.
As noted at the outset, we asked the parties to address the sentence imposed in light of State v. Manzie, 335 N.J.Super. 267, 762 A.2d 276 (App.Div. 2000), which held "that NERA does not apply to murder" and that "therefore, the 85% parole ineligibility period must be eliminated" from the sentence for murder which was imposed. Id. at 278, 762 A.2d 276. Given the fact the issue is pending in the Supreme Court, the petition for certification having been granted in Manzie, ___ N.J. ___, ___ A.2d ___(2001), and our belief that sentencing courts should impose sentences uniformly, we decline the State's invitation to reconsider the issue and potentially create a conflict on the subject prior to resolution by the Supreme Court.[8] However, we add the following comments.
The Manzie court comprehensively examined the legislative history surrounding the adoption of NERA, N.J.S.A. 2C:43-7.2. Given the unique nature of a murder sentence, since the amendment of N.J.S.A. 2C:11-3 in 1982[9] and the legislative history involved, there is substantial merit to the conclusion reached in Manzie. This is particularly the case because the thirty-year parole ineligibility term, which is unique to murder, requires the service of substantially more "real time" before parole eligibility than any other first degree crime. In fact, the required parole ineligibility term is longer than the maximum sentence for a first degree crime. See N.J.S.A. 2C:43-6a(1).[10]
The State argues, however, "that NERA must apply to murder; otherwise, a person convicted of a crime other than murder and sentenced to an extended term of life imprisonment under N.J.S.A. 2C:44-3 and *1175 N.J.S.A. 2C:43-7a will serve more time under NERA than a murderer not subject to NERA." Manzie, supra, 335 N.J.Super. at 276, n. 1, 762 A.2d 276. The Manzie court did not pass on the question of extended term applicability but expressed "reservations regarding [the] assumption" of its application and noted the lack of "analytical value" of "comparing an extended term sentence with an ordinary term." Ibid. While there is a clear difference between imposing an ordinary term based on a given offense and an extended term based on a defendant's criminal record, we feel that the issue of extended term application must be considered when evaluating the Manzie issue.[11] It would be irrational if a defendant convicted of a first or second degree "violent crime" and given a discretionary or mandatory extended term sentence could be given less "real time" than a required NERA sentence for an ordinary term. Cf. State v. Dunbar, 108 N.J. 80, 93-95, 527 A.2d 1346 (1987). It is "real time" that is critical to the question of sentencing, State v. Dunbar, supra, 108 N.J. at 94-95, 527 A.2d 1346; State v. Maguire, supra, 84 N.J. at 529-30, 423 A.2d 294; State v. Mosley, 335 N.J.Super. 144, 157, 761 A.2d 130 (App.Div.2000), and it is "real time" which NERA sought to impose. Stated differently, a defendant cannot escape the consequences of NERA by judicial imposition of an extended term resulting in less "real time" in terms of parole eligibility than an ordinary term sentence if NERA did not apply to the extended term. On the other hand, if, for example, a defendant were subject to a mandatory or discretionary extended term for an armed robbery during which a victim is killed, it would be illogical to conclude that an 85% parole ineligibility term for the presumptive fifty-year sentence for armed robbery, see N.J.S.A. 2C:43-7, 44-1f(1), could not survive the merger of the armed robbery into the felony murder if the murder carried only a thirty-year ineligibility term. See State v. Connell, 208 N.J.Super. 688, 696-97, 506 A.2d 829 (App.Div.1986).
Legislation cannot be read to produce unreasonable or irrational results. "Interpretations which lead to absurd or unreasonable results are to be avoided." State v. Gill, 47 N.J. 441, 444, 221 A.2d 521 (1966); DeBonis v. Orange Quarry Co., 233 N.J.Super. 156, 164, 558 A.2d 474 (App.Div.1989). Hence, we must "effectuat[e] the legislative plan as it may be gathered from the enactment "when read in the full light of its history, purpose and context.' Lloyd v. Vermeulen, 22 N.J. 200, 204, 125 A.2d 393 (1956)..." State v. Gill, supra, 47 N.J. at 444, 221 A.2d 521. We thus hold that the imposition of an extended term for a first or second degree "violent crime" (as defined in N.J.S.A. 2C:43-7.2d) must embody a parole ineligibility term at least equal to the NERA sentence applicable to the maximum ordinary term for the degree of crime involved. Of course, imposition of a mandatory or discretionary ineligibility term on an extended term sentence could be longer if required or authorized by statute. See, e.g., N.J.S.A. 2C:43-7. By taking this approach, we reconcile the holding of Manzie and the apparent legislative intent with a rational approach to sentencing and the Code's sentencing structure as a whole. Cf. State v. Dillihay, 127 N.J. 42, 601 A.2d 1149 (1992); State v. Gonzalez, 123 N.J. 462, 588 A.2d 816 (1991).
Finally, we add an additional reason for adhering to Manzie. The parties agree that if NERA applies to murder, the parole ineligibility term would be 63 3/4 years, *1176 that is 85% of 75 years75 years being the basis for a life sentence in light of N.J.S.A. 30:4-123.51(a) and (b) which (absent a judicial or statutory mandatory minimum term) establish primary parole eligibility at one-third of the sentence imposed or 25 years on a life sentence. See also N.J.S.A. 2C:43-7b; N.J.A.C. 10A:71-3.2(c). Hence, if NERA applied to a non-capital murder sentence, a defendant would be required to serve 33 ¾ more years before even being eligible for parole on a life sentence than he or she had to serve before the enactment of NERA.[12] While we understand that the definition of "violent crime" was added to N.J.S.A. 2C:43-7.2 (see N.J.S.A. 2C:43-7.2d) after the sponsors made their statements, see Manzie, supra, 335 N.J.Super. at 273-75, 762 A.2d 276, we have difficulty believing that the Legislature would take action having such impact on our sentencing lawand the life of a person, even one convicted of murderbased on the rationale of the sponsors, as detailed in Manzie, or without any legislative history or statement to support that intent.
The judgment of conviction is affirmed, but we remand to the Law Division to vacate the NERA term. However, we stay our mandate pending the Supreme Court's decision in Manzie.
NOTES
[1] The judgment also provides that defendant "shall not be eligible for parole" "[d]uring the first thirty (30) years of said term."
[2] Although she could not see his face, Waller testified that she could identify the voice of Ben McNeil, her "little cousin's father."
[3] The trial judge declared a mistrial during the first jury selection in light of a violation of State v. Gilmore, 103 N.J. 508, 511 A.2d 1150 (1986), and defendant argues that the prosecutor's conduct was inappropriate and prejudicial because the defendant is Afro-American and possibly because the jury may have believed the victim was white. We are told that the victim was also Afro-American, although there was testimony at trial that he was "light skinned."
[4] Defendant argued that he was "incredulous[ly]" not informed of the accident and related memory loss until that fact was brought out during cross-examination at trial. The prosecutor stated that he was told Whitfield had "hurt her head" but "was not aware of any type of failure to remember the incident." To support its position, an investigator testified before the judge, outside the presence of the jury and at the end of the trial, that he interviewed Whitfield with the Assistant Prosecutor at the Middlesex County Jail four days before trial, and "[s]he mentioned that she banged her head." According to the investigator's testimony, Whitfield said nothing about a "memory loss," a related hospitalization, or "being unable to remember the incidents."
[5] Waller also saw a van at the scene. However, she described the van as being blue and testified that it swerved to avoid hitting the victim as he lay in the street.
[6] The record reflects that the trial judge indicated he intended to report the prosecutor to the District Ethics Committee for the Gilmore violation as a means of deterring further such conduct. Defendant does not ask us to adopt a per se rule requiring reversal when a trial judge refers a matter to the District Ethics Committee as a result of a prosecutor's conduct at trial. Accord State v. Frost, supra, 158 N.J. at 88, 727 A.2d 1. In any event, we were told at oral argument, without dispute, that the trial judge ultimately decided not to refer the matter to the Ethics Committee. We add that this is not the occasion to consider whether the finding of multiple Gilmore violations by the prosecutor and discharge of multiple panels can preclude trial on the grounds of due process or "fundamental fairness."
[7] See Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).
[8] The parties appear to agree that if Manzie is reversed, elimination of the required NERA can be corrected at any time in light of the legal requirement of the mandatory ineligibility term. We nevertheless stay the remand proceedings we herein order pending the Supreme Court's decision in Manzie.
[9] For crimes occurring between September 1, 1979 and August 6, 1982, an extended term for murder could be imposed without consideration of the criteria otherwise applicable to extended terms. See State v. Maguire, 84 N.J. 508, 521-26, 423 A.2d 294 (1980). See also State v. Serrone, 95 N.J. 23, 27, 468 A.2d 1050 (1983) (life imprisonment for murder was an ordinary term).
[10] As Manzie points out, two crimesaggravated manslaughter, N.J.S.A. 2C:11-4a, and kidnapping, N.J.S.A. 2C:13-1, ordinarily carry thirty-year maximum sentences. N.J.S.A. 2C:11-4c, 2C:13-1c(1). There are also special parole provisions in capital murder cases in which the death penalty is not imposed. See N.J.S.A. 2C:11-3b, amended by L. 2000, c. 88 § 1.
[11] Because the Manzie case is now before the Supreme Court, we do not believe this is the occasion to consider the impact, if any, of N.J.S.A. 2C:43-7.1, adopted less than two years before NERA, on the question of legislative intent. Like N.J.S.A. 2C:43-7 and 2C:44-1f, the "Three Strikes and You're In" Law, N.J.S.A. 2C:43-7.1, has real impact on the "real time" sentence of violent offenders. See N.J.S.A. 2C:43-7.1b ("extended term for repeat violent offenders"). The relation between the "Three Strikes and You're In" law, which is based on the record when certain crimes are committed, is relevant to legislative intent when dealing with sentencing for a single offense under NERA.
[12] Of course, he could receive a sentence of a specific number of years between thirty years and life imprisonment, N.J.S.A. 2C:11-3b(1), and if applicable, the length of the NERA ineligibility term would depend on the sentence imposed. On the other hand, if our interpretation of the Parole Act is incorrect and a life sentence cannot be quantified for purposes of NERA, the result in Manzie would be correct because there would be no basis on which to fix an 85% parole ineligibility term on a life sentence for murder or an extended sentence for a first degree crime, and it would be illogical to believe that the Legislature would have envisioned a thirty (or thirty-five) year parole ineligibility term for a life sentence for a person convicted of murder and a twenty-five year parole ineligibility term for other persons sentenced to life imprisonment, see N.J.S.A. 2C:43-7, but greater ineligibility terms for those sentenced to a lesser number of years for murder or an extended term for a first degree crime.