### 19298. LANGFORD *v.* THE STATE.

ARGUED APRIL 9, 1956—DECIDED MAY 14, 1956.

*Wm. P. Holley, Jr.,* for plaintiff in error.

*Roy Leathers,* Solicitor-General, *Clarence Peeler, Jr.,* Assistant Solicitor-General, *Eugene Cook,* Attorney-General, *Rubye G. Jackson,* contra.

CANDLER, Justice. Harvey Langford was indicted in the Superior Court of Clayton County for the murder of O'Neal Clemmons. On his conviction of that offense without any recommendation, he was sentenced to be electrocuted. He moved for a new trial on the usual general grounds and amended his motion by adding three special grounds. His amended motion was denied, and the exception is to that judgment.

The defendant has expressly abandoned all special grounds of his motion except special ground one, which alleges that the trial judge erred in failing to charge, without request, on the law of voluntary manslaughter resulting from mutual combat. Respecting this contention, Leonard Nash, a witness for the State, testified that he was at the home of the deceased on Saturday night before he was killed by the defendant on the following

morning. The defendant was also there at the same time. The defendant and the deceased got into an argument about a hog the deceased had sold to the man on whose land the defendant lived. The deceased accused the defendant of telling a lie about the value of the hog. The defendant got mad and told the deceased to stay there until he got back as he was going to get a gun and kill him. As a witness for the State, Bose Green testified that the defendant came to his home about 2 o'clock a. m. on the day he killed O'Neal Clemmons at about 8:30 a.m. At that time, the defendant had a shotgun in his hands. He took a shell out of his gun, which was loaded with buckshot, and said that Clemmons had mistreated him and that he was going to kill him if it was the last thing he did. He also testified that during the same conversation the defendant said: "I know it's mighty bad for him to leave all those little children, but he's show going to leave them 'cause I'm show going to kill him. . . I'm going to do it and ain't going to be nothing done about it; white folks is going to hold me up here. I'm going to put it [my gun] in my car and everywhere I go I'm going to carry it. First place I catch him out at, that's where I am going to blow him away at." Other witnesses for the State testified that they heard the defendant make similar threats against the deceased immediately prior to the killing. Willie Dodson, also a witness for the State, testified that he was present and saw the defendant kill O'Neal Clemmons. The deceased had just finished pulling a boy's car out of a ditch with his truck and tractor, and he (the witness), the deceased, and several others including some children, were standing in the road talking when they saw the defendant coming down the hill toward them in his automobile. Before reaching them, the defendant turned out of the road and into the yard of Mason George. He stayed in there a few minutes, not long, came back out of the yard, and crossed the bridge coming by Blue Top Road where they were standing. He backed into Blue Top Road, turned his automobile around, parked it, and jumped out with a shotgun in his hand. After doing so, he immediately asked the deceased what he had been saying about him, and "then he fired at the same time he was asking." He then got back in his automobile and left. Andrew Weemes, a witness for the State, testified that he was also present when the defendant killed Clemmons, and his evidence relating to the homicide is

substantially the same as that given by the witness Dodson. Willie Frank George, a witness for the State, testified that he was eleven years old and the son of Mason George, and that the defendant, just before killing Clemmons, drove an automobile into his father's front yard, loaded his shot gun, inquired about his father, backed out of the yard, and went on down the road. The evidence shows that the deceased, after being thus attacked by the defendant, undertook only to defend himself with a shotgun which he had in his truck. The defendant offered no evidence. The record shows that eight persons, other than the defendant and the deceased, were present when the homicide occurred and witnessed the killing. Applying to the facts of the instant case the rulings made in *Johnson* v. *State,* 173 *Ga.* 734 (161 S. E. 590), *Mathis* v. *State,* 196 *Ga.* 288 (26 S. E. 2d 606), and *Joyner* v. *State,* 208 *Ga.* 435 (67 S. E. 2d 221), there is no merit in the contention that the court erred in failing to charge on voluntary manslaughter resulting from mutual combat, without a request therefor. Mutual combat exists where there is a fight with dangerous or deadly weapons, and when both parties are at fault and are willing to fight because of a sudden quarrel. Code § 26-1014; *Harris* v. *State,* 184 *Ga.* 382, 390 (191 S. E. 439); *Brannon* v. *State,* 188 *Ga.* 15 (1) (2 S.E. 2d 654); *Watson* v. *State,* 66 *Ga. App.* 242 (17 S.E. 2d 559). The essential ingredient, mutual intent, in order to constitute mutual combat, must be a willingness, a readiness, and an intention upon the part of both parties to fight. Reluctance, or fighting to repel an unprovoked attack, as in this case, is self-defense and is authorized by the law, and should not be confused with mutual combat. It is a well-settled principle of law that an aggressor will not be allowed, under the law, to mitigate his crime on the theory of mutual combat when it appears that his victim had no desire to fight, and intended to fight only to the extent that a defense of his person against an unprovoked assault was necessary.

■ The evidence was amply sufficient to support the verdict. Hence there is no merit in the general grounds of the motion.

It follows from what has been said above that the judgment complained of is not erroneous for any reason assigned.

*Judgment affirmed. All the Justices concur.*