285 N.J. Super. 607 (1995)
667 A.2d 1103
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
DANIEL PASTERICK, JR., DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Submitted October 12, 1995.
Decided December 14, 1995.
*609 Before Judges LONG, MUIR, Jr. and BROCHIN.
Susan L. Reisner, Public Defender, attorney for appellant (Ruth Bove, Assistant Public Defender, of counsel and on the brief).
Deborah T. Poritz, Attorney General of New Jersey, attorney for respondent (Craig V. Zwillman, Deputy Attorney General, of counsel and on the brief).
The opinion of the court was delivered by BROCHIN, J.A.D.
Defendant Daniel Pasterick, Jr. was indicted for purposeful or knowing murder (N.J.S.A. 2C:11-3a(1) and -3a(2)); felony murder predicated on robbery (N.J.S.A. 2C:11-3a(3)); two counts of robbery (N.J.S.A. 2C:15-1); and unlawful use of a credit card, knowing that it had been stolen (N.J.S.A. 2C:21-6d). His first trial ended in a mistrial after ten days because a deliberating juror failed to disclose that she had been charged with murder in 1972 and no alternate was available. His second trial ended in a mistrial after two days because his attorney became ill and was taken to the hospital. Defendant's third trial resulted in a verdict. He was acquitted of felony murder and convicted of purposeful and knowing murder, of two counts of third degree theft as lesser included offenses of robbery, and of fourth degree unlawful use of a credit card.
Defendant was sentenced to life imprisonment with thirty years' parole ineligibility for murder, to five years' imprisonment for *610 each of the theft convictions, and to one year's imprisonment for unlawful use of a credit card. The sentences for all of the convictions other than murder were made concurrent to each other and consecutive to the sentence for murder.
The victim of all these crimes was defendant's father. Defendant committed the homicide on September 3, 1989, his twenty-first birthday. His parents were divorced. Until a few days earlier, he had been living with his father in a mobile home. His father had ordered him out of their home because, according to defendant's trial testimony, defendant had forged his father's name on an application for a bank credit card and had then used the credit card to obtain merchandise or cash. A warrant was outstanding for defendant's arrest on the credit card charge. At about the same time, Kim, defendant's girlfriend, had ended their relationship because his father had told her about the credit card fraud and because defendant was unable to pay for a vacation cruise and a diamond ring that he had promised her.
Defendant knocked on his father's door at approximately 7 a.m. on September 4, 1989. Defendant told his father that he wanted to collect some of Kim's belongings in order to return them to her. Defendant's father invited him inside and wished him a happy birthday. After collecting the articles he wanted to return to Kim, defendant and his father sat drinking coffee and tea together and watching television. They began to talk about the warrant for defendant's arrest for credit card fraud. His father urged him to turn himself in. Defendant said that he was reluctant to submit to arrest because of what he had experienced during a previous incarceration.
Sylvia, the father's girlfriend, was on an airplane due to arrive sometime around noon that same day. Before defendant was satisfied to end their conversation, his father interrupted it to get ready to go to the airport to meet her. Defendant testified that he was "very hurt" because their conversation was not yet completed. An argument developed that culminated in the homicide.
*611 According to the State's pathologist who autopsied the victim, defendant's father sustained three large stab wounds, a wound to the right upper chest, a wound to the left upper abdomen, and a wound to the left upper arm. The wound to the right upper chest penetrated the lung and caused significant internal and external bleeding. The wound to the arm cut through muscle tissue and also caused substantial bleeding. The wound to the abdomen was five inches deep and had penetrated the mesentery, but had caused very little bleeding. During the autopsy, a knife blade was discovered to be embedded in the abdominal wound. The knife handle was found near the body. From the fact that the blade was found in the wound, the pathologist inferred that it was the last knife wound inflicted. From the fact that it caused relatively little bleeding, he inferred that it had been inflicted either while the victim was in the last throes of dying or while he was already dead.
There were also several comparatively minor stab wounds to the victim's chest, and there were contusions and abrasions on his face, left knee and elbows. There were stabs and cuts on his hands that were described as defense wounds. In addition, he had suffered a blunt injury to the back of his head caused either by a fall or by his having been struck by a blunt, heavy object. This blow to the victim's head had resulted in a subdural hematoma. Blood vessels had ruptured, and there was a large area of hemorrhaging and swelling of the brain. In the opinion of the State's pathologist, this blow would have stunned the victim or rendered him unconscious.
The police who found the victim's body observed blood on the living room carpet of his home, on the curtains, the television set, the coffee table, on the front of the kitchen stove, in defendant's bedroom, and on various other articles. The right rear pocket of the pants that the victim was wearing was empty and had been partially turned out.
When defendant was arrested the next day, he had a scratch on his left cheek, a scratch on his forehead, cuts on his pinkie, his *612 index finger and the palm of his left hand, cuts on the pinkie and index finger of his right hand, and a laceration on his left forearm.
According to defendant's trial testimony on direct examination, when his father interrupted their conversation about his submitting to arrest for credit card fraud, defendant said that he was upset because his father spent more time with his girlfriend's family than with his own. Defendant's father put his arm around defendant to escort him out the door. Defendant pushed his arm away. There was further pushing and shoving, initiated by defendant. At some point, defendant pushed his father into the refrigerator. The father "grabbed a knife from the butcher block between the stove and the ... refrigerator.... [and] held it out in front of him." They were about an arm's length apart. Defendant testified that he didn't know what to do because he had never previously been confronted by someone holding a weapon. He was afraid because his father became very angry when defendant talked about Sylvia's family. Defendant didn't know what his father was going to do with the knife. When asked why he didn't just walk out the back door, defendant replied that he had "never been in that situation before." When asked whether he was in fear for his life, he answered, "I didn't know what was going to happen, so...."
Defendant testified that a violent struggle ensued. According to him, furniture was knocked down, and he and his father fought, both while standing and while thrashing around on the floor. Defendant says that his father punched him in the head and he punched his father. He claimed that his major concern was to defend himself. He testified that he never possessed the knife, that his father had it throughout the struggle. The implication of his testimony was that his father was wounded by accident.
When the fight was over and defendant's father was lying on the floor bleeding, defendant dabbed at his father's abdominal wound with a pillow case. Then defendant went to his bedroom, took his own clothes off and took a shower because he was covered with blood. His father told defendant that he loved him, that he *613 thought he was dying, and that he didn't know "why it happened like this." Defendant did not call for help. He took the wallet from his father's back pocket, with approximately $110 in it, and he took his father's car keys from the counter. He drove his father's car to a shopping mall to meet Kim in order to return her belongings. At the mall, he used his father's credit card to obtain a cash advance and to buy a diamond engagement ring "to try to make amends for our breaking up of our relationship, try to make things better." He also used his father's checkbook. That evening, he had dinner with Kim at a restaurant. He was arrested at Kim's house the next day.
On appeal, defendant argues the following points:
Point I. The court's instruction that "gestures, no matter how abusive, threatening or insulting, are ordinarily not such provocation" was erroneous and deprived defendant of his passion/provocation defense and due process. (Not raised below.)
Point II. The rebuttal testimony of State's expert, Dr. Kull, was elicited in violation of the rules of evidence, and was so prejudicial and so devastating to the defendant that its erroneous admission mandates reversal of defendant's convictions. (Not raised below.)
Point III. The admission of "other crimes" and "bad character" evidence in the State's case in chief, severely prejudiced the defendant's right to a fair trial and violated Evid.R 55, 47, 48, and 4.
Point IV. The admission of gruesome photographs deprived defendant of the right to a fair trial. (U.S. Const. Amends., VI, XIV; N.J. Const. (1947) Art. I, Pars. 9, 10).
Point V. The trial court's failure to adequately charge the jury as to both the impact of imperfect self-defense, and causation in the murder, passion/provocation and aggravated/reckless manslaughter charge, deprived defendant of due process and a fair trial. U.S. Const. XIV; VI; N.J. Const. Art I, Par. 10.
Point VI. The defendant's sentence is excessive.
The following is the portion of the trial court's charge to the jury to which defendant now objects:
How does the law define reasonable provocation? First, words alone are normally not enough, or looks, or gestures, no matter how abusive, threatening or insulting, are ordinarily not such provocation.
This language appears to have been taken from a version of the Model Jury Charges, (Criminal) § 2.232 Manslaughter, which was approved October 15, 1979. Its corresponding language reads:

*614 Now, what does the law recognize as provocation which would permit you jurors to find that the offense is manslaughter rather than murder? First, mere words alone, or looks or gestures, no matter how abusive, threatening, or insulting are never such provocation.
When the present case was tried, however, that charge had been superseded by a revised version, which reads:
The provocation must be sufficient to arouse the passions of an ordinary person beyond the power of his/her control. For example, words alone do not constitute adequate provocation. On the other hand, a threat with a gun or knife or a significant physical confrontation might be considered adequate provocation.[1]
[(Model Jury Charges, (Criminal) Murder, Passion/Provocation and Aggravated/Reckless Manslaughter, (revised 6/24/91). (Footnote omitted) (Emphasis added)].
The revised charge accurately reflects the Supreme Court's decision in State v. Mauricio, 117 N.J. 402, 414, 568 A.2d 879 (1990), which pointed out, citing State v. Powell, 84 N.J. 305, 320, 419 A.2d 406 (1980), and State v. Bonano, 59 N.J. 515, 523-24, 284 A.2d 345 (1971), that "the Court has held that a threat with a gun or knife might constitute adequate provocation."
Since the defendant in the present case relies on a "gesture"  his father's holding a steak knife in front of himself when defendant pushed him against the stove and refrigerator  the difference between the language of the old version and the new was potentially prejudicial if the facts of the case warranted a passion/provocation charge. Whether they did or did not is the more difficult question. We note, however, that during the trial itself, the trial judge, the prosecutor and the defense counsel all were of *615 the view that a passion/provocation charge was appropriate. Furthermore, when a defendant requests such an instruction, as he did in this case, the court must submit it to the jury if there is a rational basis for the jury's returning a verdict of passion/provocation manslaughter. N.J.S.A. 2C:1-8e ("The court shall not charge the jury with respect to an included offense unless there is a rational basis for a verdict convicting the defendant of the included offense."); see State v. Robinson, 136 N.J. 476, 490-91, 643 A.2d 591 (1994); State v. Mauricio, supra, 117 N.J. at 417-18, 568 A.2d 879.
Passion/provocation manslaughter has four elements: the provocation must have been adequate; the defendant must not have had time to cool off between the provocation and the slaying; the provocation must have actually impassioned the defendant; and the defendant must not have cooled off before the slaying. State v. Perry, 124 N.J. 128, 159, 590 A.2d 624 (1991); State v. Mauricio, supra, 117 N.J. at 411, 568 A.2d 879. The first two criteria are objective. The latter two are subjective. Ibid. In the present case, the State contends that if the charge was erroneous, the error was harmless because the evidence was insufficient to permit a rational jury reasonably to conclude that the provocation was objectively adequate. See State v. McClain, 248 N.J. Super. 409, 416-17, 591 A.2d 652 (App.Div.), certif. denied, 126 N.J. 341, 598 A.2d 897 (1991) (holding that failure to charge jury that State had burden of proving beyond a reasonable doubt that defendant did not act in the heat of passion was harmless because the evidence did not support a charge on passion/provocation manslaughter).
When defendant was arrested, he gave a tape recorded statement to the police. At trial, defendant readily conceded that he had given his statement voluntarily after having been advised of his constitutional rights to consult an attorney and to remain silent. His description at trial of his confrontation with his father was less detailed than his tape recorded description, but the two versions were not materially inconsistent. The tape recording of *616 the statement was played to the jury. In his statement, defendant conceded, as he did in his direct testimony, that he had started the pushing and shoving with his father. His statement then continued as follows:
Well I pushed him, he went up against the refrigerator at first and then like he pushed me back and said, he said he doesn't need this right now . .. we'll talk about it later.... So again I pushed him and I pushed him a little bit harder that time and we've already had one or two domestic squabbles .. . one time I almost beat him up, because I told him he drank too much....
....
When I pushed him that time ..., I pushed him up against ... the stove area ... and there's like a block where knives sit in.... He then took [a steak knife] out.
....
... I know my father was very hurt and he told me that he's very hurt from the last argument we got into and he, he said he saw a look in my eye, that he thought I was going to beat the shit out of him. And you know, I think after the second time I pushed him and everything, he knew I was angry.... He then took a knife out of the thing and he didn't come at me with it, but, he like held it there, like as self-defense, I guess, he thought I was going to get violent with him.
....
... I tried to get it away from him ... he didn't come at me with it ... step towards me to come at me with it, but he held his ground and he stood there with a knife in his hand, like out in front of him, like, to keep me from getting to him.
Defendant then relates that as he tried to take the knife away from his father, defendant's hands were cut. His father "didn't seem like he wanted to use [the knife] on me, you know, he wasn't... slashing at me or anything like that." They tumbled to the ground. Defendant says that he was stabbed on the forearm. Defendant claims that he did not retaliate, but that "[t]he knife was somehow ended up between us and I guess I stabbed him, I, I couldn't tell you where."
Mutual combat under certain circumstances may constitute adequate provocation to reduce murder to manslaughter. State v. Crisantos, 102 N.J. 265, 274-75, 508 A.2d 167 (1986). But, this was not a mutual combat.

*617 A mutual combat requires a mutual intent to fight, as distinguished from an encounter where one is attacking and the other is merely defending himself, in which case a homicide by the defender would not even be unlawful.

Charles E. Torcia, 2 Wharton's Criminal Law § 161, at 361 (15th ed. 1994).
In this case, the evidence is clear that defendant's father refrained from attacking his son despite defendant's assault. Defendant reiterates that his father was only seeking to defend himself. The savagery of the victim's wounds indicate that defendant became impassioned, perhaps when he was cut attempting to wrest the knife away from his father. However, we hold that, in the circumstances disclosed by the present record, the passion of an assailant aroused as the result of injuries inflicted by his victim attempting to defend himself is, as a matter of law, insufficient to mitigate the assailant's culpability for the resulting homicide. Cf. State v. Purnell, 126 N.J. 518, 541, 601 A.2d 175 (1992) ("Several scratches and bruises when compared to fifteen stab wounds do not suggest mutual combat."); see Langford v. State, 212 Ga. 364, 93 S.E.2d 1, 3 (1956) ("It is a well-settled principle of law that an aggressor will not be allowed, under the law, to mitigate his crime on the theory of mutual combat when it appears that his victim had no desire to fight, and intended to fight only to the extent that a defense of his person against an unprovoked assault was necessary."); People v. Austin, 133 Ill.2d 118, 139 Ill.Dec. 819, 549 N.E.2d 331 (1989) ("One who instigates combat can not rely on the victim's response as evidence of mutual combat sufficient to mitigate the killing of that victim from murder to manslaughter.). Consequently, the trial court's incorrect charge on passion/provocation manslaughter was harmless error and, in the absence of other prejudicial error, a reversal of the conviction would not be necessary.
However, the testimony of Dr. Richard Kevin Kull, a psychiatrist whom the State presented as a rebuttal witness was grossly improper and prejudicial, and it requires us to reverse the defendant's conviction. Dr. Kull expressed the opinion that "defendant's behavior during and after the alleged offense is not the product of a psychiatric disturbance." Dr. Kull first related the *618 defendant's history as he had elicited it from the defendant. This recitation was not materially different from what the jury had already been told. He then proceeded to relate what he had learned from other sources that contradicted defendant's version of the facts. He told the jury that defendant's high school girl friend reported that in defendant's senior year he started losing friends because of his gambling; that he began to terrorize her when she wanted to end their relationship; that he attacked her on several occasions, on one instance pinning her up against a wall until she was rescued, on another occasion throwing her onto the lawn and biting her lip until it bled, and in another instance, dragging her down the street so that she feared for her life until someone intervened; and that she was convinced that he had vandalized her car and thrown a boulder through the window of her home. Dr. Kull said that defendant's girlfriend told him that defendant was a liar, that he stole his mother's diamond ring, gave it to her, and when defendant's parents recognized the ring, denied that he had stolen it. Dr. Kull also said that defendant's girlfriend told him that "she was aware that he would hit his family members if he didn't get his way."
Without attributing the information to a specific source, Dr. Kull informed the jury that defendant "has criminal charges against him for stealing a credit card from his father's apartment and using it unlawfully" and "for falsely completing an application for a credit card with his father's name, social security number and work history." The defendant used that card, Dr. Kull stated, twenty times at racetracks and hotels for a total of $5000.
The witness reported he had reviewed out-of-court testimony given by Sylvia, the father's girlfriend, in which she had stated that defendant could not hold a job, gambled on everything, stole from his father, his mother and his aunt, and borrowed money from friends and never returned it. Dr. Kull stated, perhaps on the basis of Sylvia's testimony, that after defendant's father threw him out of the house, defendant stayed with his mother until he *619 stole property from her, and then stayed with his aunt until he stole property from her.
Dr. Kull then informed the jury that defendant's sister, Patricia, had told him that defendant "was the best liar and someone who is very good at conning people." The doctor reported that in a telephone interview, she told him that defendant "lied, cheated and stole from his friends and would then deny it...."; that he stole a class ring from a friend and then wrote to the friend insisting that he needed the ring more than his friend did; that he took money, checks and valuables from his mother, from his father and also from her, and would deny doing so even when caught red-handed; that lying was a way of life for defendant; that she saw defendant push and shove his father when he didn't get his way; and that defendant broke his mother's fingers on one occasion. Dr. Kull also told the jury that defendant's mother had substantially confirmed these reports, including the report that defendant had broken her finger.
At this point in Dr. Kull's testimony, the trial judge interrupted sua sponte and instructed the jury:
[Y]ou cannot consider what these people told Dr. Kull as substantive evidence of any guilt or innocence of the defendant. It is offered to you only as evidence tending to support the ultimate conclusion of Dr. Kull. All right? It's not offered, the witness isn't necessarily saying what is given to him is true, but, rather, this is what he based his opinion on and why he came to the conclusion that he did, and you can only consider it for that purpose.
After this interruption, Dr. Kull continued on with substantial additional testimony of a similar sort. Then he offered the opinion that defendant was a pathological gambler; that lying was frequently associated with pathological gambling; and that he had seen extensive evidence of lying in this case. Dr. Kull's second diagnosis was that defendant's personality "ha[d] elements of antisocial and narcissistic traits." This was evidenced, the witness said, by an unstable and inconsistent work history, failure to conform to social norms, stealing, reacting to criticism with rage, etc. Then Dr. Kull offered the following critique of the defendant's case:

*620 His descriptions of what happened really do not conform to the physical evidence. The physical evidence suggests that there was a brutal beating with multiple stabbings of the father, and the son only has minor cuts, some of which were thought by some to be self-inflicted.
If his past behavior is to be any clue today, we could speculate that [defendant] became progressively more insistent, abusive and physical with his father when his father would not give in to what [defendant] wanted.
....
I simply do not feel the defendant's story could be taken at face value. I feel we can't fully understand events of that day by his account alone. He has a very long history of lying, corroborated by all sources that were known to me.
At the conclusion of Dr. Kull's direct testimony, the trial judge interjected an admonition to the jury that "when the doctor testifies that he didn't believe the defendant, the ultimate conclusion on what happened or didn't happen, who to believe and who not to believe is up to you."
If this testimony by Dr. Kull were admissible, the State hardly needed either its other witnesses or the prosecutor's closing argument. It was patently inadmissible and grossly prejudicial. It should have been objected to by defendant's attorney, and the torrent of hearsay should have been stopped by the trial judge on his own motion. There is no provision in our legal system for a "truth-teller" who is authorized to advise the jury on the basis of ex parte investigations what the facts are and that the defendant's story is a lie. See State v. J.Q., 252 N.J. Super. 11, 39, 599 A.2d 172 (App.Div. 1991) (noting that expert opinion regarding the truthfulness of other witnesses is not provided for in the Rules of Evidence), aff'd 130 N.J. 554, 617 A.2d 1196 (1993).
We recognize that an expert who relies on hearsay as the basis of his opinion may relate that hearsay as part of his direct testimony. Compare Tramutola v. Bortone, 63 N.J. 9, 15, 304 A.2d 197 (1973) (allowing doctor to testify to out-of-court statements which he had used in forming his opinion) with State v. Rose, 112 N.J. 454, 499-501, 548 A.2d 1058 (1988) (stating that it was improper and unethical for a prosecutor to have elicited otherwise inadmissible evidence from a defense expert which the expert had used in forming her opinion). But, an expert's opinion *621 may be based only on information of a type which experts in the relevant field of practice reasonably rely on in reaching conclusions of the type offered by the witness. N.J.R.E. 703; Ryan v. KDI Sylvan Pools, Inc., 121 N.J. 276, 288-89, 579 A.2d 1241 (1990). No evidence was offered that inquiries of the sort relied on by Dr. Kull are reasonably relied on by psychiatrists in making psychiatric diagnoses.
Furthermore, when Dr. Kull offered his rebuttal testimony, defendant's psychiatrist had already testified that defendant was not suffering from a mental disease or defect. Defendant's personality traits, which Dr. Kull said did not amount to a disease or defect that should excuse or mitigate his conduct, were immaterial to the case, or at least of only minimal materiality, unless a psychiatric evaluation of the trustworthiness of a witness's testimony is admissible to assist the jury's weighing of credibility. State v. J.Q., supra, 252 N.J. Super. at 39, 599 A.2d 172 (credibility is an issue reserved exclusively for the jury); United States v. Whitted, 11 F.3d 782, 785-87 (8th Cir.1993). Assuming arguendo that such a psychological evaluation of the credibility of a witness would ever be admissible, it surely could not be admitted without a substantial foundation establishing its scientific validity. See Landrigan v. Celotex Corp., 127 N.J. 404, 413-14, 417, 605 A.2d 1079 (1992). No such foundation was offered in this case.
The State does not attempt to defend the propriety of Dr. Kull's testimony on its merits. Instead it argues that defendant waived any objection to the testimony because he did not assert it at trial and that, in view of the other deprecatory testimony in the record, the admission of Dr. Kull's testimony was not prejudicial.
We disagree and hold that Dr. Kull's testimony was so prejudicial to defendant that, even if it were marginally relevant and otherwise admissible, failing to exclude it under N.J.R.E. 403 was a mistaken exercise of the trial judge's discretion. State v. Manning, 82 N.J. 417, 413 A.2d 605 (1980) (holding that despite limiting instruction, police officer's testimony that defendant's companion had implicated him in robbery should have been excluded *622 as unduly prejudicial); State v. Prudden, 212 N.J. Super. 608, 613-14, 515 A.2d 1260 (App.Div. 1986) (holding that despite limiting instruction, letter written by murder victim shortly before his death was improperly admitted). Dr. Kull's testimony acquainted the jury with other alleged instances of defendant's anger leading to violence, and it purported to analyze and discredit his testimony. Although part of the substance of what Dr. Kull testified to had already been related to the jury, his narrative repetition of it so close to the end of the case gave it the effect of a grand finale. It was unnecessary and, although not objected to, we hold that it was plain error because it deprived defendant of his right to a fair trial. R. 2:10-2; see State v. Medina, 254 N.J. Super. 668, 679, 604 A.2d 197 (App.Div. 1992); LaPorte v. Bott, 173 N.J. Super. 590, 597, 414 A.2d 1363 (App.Div. 1980).
Defendant's other arguments are without merit. R. 2:11-3(e)(2). The State's theory of its case was that defendant went to his father's home determined to get money from his father and willing to do what he had to do in order to accomplish his purpose. That theory rested on permissible inferences from the facts. The admission of competent "other crimes" and "bad character" evidence during the State's case-in-chief was admissible in support of that theory to show defendant's motive and intent. The autopsy photographs to which defendant objects as "gruesome" tended to show the savagery of defendant's attack on his victim and were therefore relevant to refute defendant's claim that his father's wounds were inflicted accidently.
The judgment appealed from is reversed and the case is remanded for a new trial.
NOTES
[1] Subsequent to trial, the model charge was revised once again. The charge currently reads:

The provocation must be sufficient to arouse the passions of an ordinary person beyond the power of his/her control. Words which are mere insults do not constitute adequate provocation. However, when the words and surrounding circumstances convey a significant threat, even one that does not put the defendant's life at current risk, they may provide adequate provocation. On the other hand, a threat with a gun or knife or a significant physical confrontation might be considered adequate provocation.
The minor changes in this portion of the charge are not significant for the purposes of this appeal.