799 A.2d 1 (2002)
351 N.J. Super. 467
STATE of New Jersey, Plaintiff-Respondent,
v.
Peter VANDEWEAGHE, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Submitted April 15, 2002.
Decided May 30, 2002.
*2 Peter A. Garcia, Acting Public Defender, attorney for appellant (Stephen W. Kirsch, Assistant Deputy Public Defender, of counsel and on the brief).
Peter C. Harvey, Acting Attorney General, attorney for respondent (Wendy Alice Way, Deputy Attorney General, of counsel and on the brief).
Before Judges KESTIN, STEINBERG, and ALLEY.
*3 The opinion of the court was delivered by STEINBERG, J.A.D.
An Atlantic County grand jury returned Indictment No. 98-9-2212 charging defendant Peter Vandeweaghe with one count of purposeful or knowing murder, N.J.S.A. 2C:11-3(a)(1)(2). A jury found defendant guilty of murder. Pursuant to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2, the trial judge sentenced defendant to a life term, with eighty-five percent of that term, or sixty-two years, six months, and nineteen days, to be served without parole. In addition, the judge imposed a period of five years of parole supervision upon defendant's release from prison. The appropriate mandatory monetary penalties, fees, and assessments were also imposed. Defendant appeals. We reverse.
According to the State's proofs, on July 24, 1998, at approximately 10:30 p.m., Gerome Neal, a bell captain at the Howard Johnson Hotel (Howard Johnson) on Chelsea Avenue in Atlantic City, said that a young male came into the hotel and asked him to call the police because "someone was getting beat up across the street." Neal looked out the window and observed a woman on the ground and a man kicking her. He went to the front desk and asked Melinda Bowman, the front desk manager, to call the police. Neal said another young male came into the hotel and asked that the police be called because someone was "being beat up across the street." In addition, an elderly couple came in and asked that the police be called. After the police arrived, Neal went outside and saw the police place the man he had seen kicking the victim in handcuffs. He also observed the police place the victim on a stretcher and into an ambulance. At trial, Neal identified defendant as the person he saw kicking the victim.
Earlier in the evening, at approximately 9:53 p.m., Atlantic City Police Officer Dennis McGee had been dispatched to the Flamingo Hotel (Flamingo) on Chelsea Avenue to investigate a report of a male beating a female. The Flamingo is diagonally across the street from the Howard Johnson. He observed the victim sitting at the top of the stairs, with defendant standing about ten feet away from her. He did not observe any fresh injuries on the victim, but asked if she wanted to sign a complaint or go to the hospital. According to McGee, the victim answered no to both inquiries. The Flamingo also declined to file a complaint. Consequently, McGee advised defendant and the victim to leave the area.
At 10:23 p.m. that evening, McGee was dispatched to the Howard Johnson. Upon his arrival, he observed defendant standing over the victim kicking her in the head. McGee got out of the car and approached defendant. He saw that defendant had the victim "by the arm and he was pulling her and telling her to get up." He recognized defendant as the person he had seen earlier at the Flamingo. However, the victim looked different. He said, "Her face was all puffed up, her eyes were closed. She looked pretty beat up."
McGee placed defendant under arrest and gave him his Miranda[1] warnings. According to McGee, defendant said, "I love her. I wouldn't hit her." On the way to the Public Safety Building, defendant said, "We don't have to do this, this isn't necessary." McGee said defendant had no problem communicating with him and was able to give McGee his pedigree information. Defendant's "speech was intelligible," and he was not "slurring." Defendant *4 had no difficulty in walking, and he appeared "to understand everything that was going on." However, McGee detected an odor of alcohol emanating from defendant.
Atlantic City Police Officer Michael Ruzzo also testified on behalf of the State. He arrived at the Flamingo shortly after McGee, and he also responded to the dispatch to the Howard Johnson. Ruzzo observed the victim laying on the ground and defendant "standing over top of her." He said the victim looked different than she had earlier. She had some facial injuries, and was "somewhat out of it. She didn't respond. She was laying on the ground. She was like semi-unconscious." He said defendant appeared to have been drinking, "but he seemed to be functioning fine" and understood what was going on. Ruzzo informed the jury about two of his previous encounters with defendant, as well as conversations he had engaged in with defendant about drinking alcohol. Defendant told him "he could drink like six or seven quarts of beer, he'd have maybe one or two bottles of wine, and some vodka [daily]." Defendant also told Ruzzo he had been drinking that way for a long time. According to Ruzzo, on the night of the incident, defendant had no difficulty walking or talking.
Joshua May, a guest at the Howard Johnson, testified that he was outside the hotel when he observed a male standing and a female sitting on a ledge directly across from the hotel. The man was walking back and forth. He saw the man attempt to force the woman to stand, to no avail. She sat down on the sidewalk. According to May, the man slapped her, was "swearing at her and telling her to get the fuck up." He said the man then pulled "her like a person carries a person off a football field, they straddle the person's arm over them and carry them off." May also heard defendant accuse the victim of stealing "five beers from [him]." He then observed defendant kick the victim in the head "[a]t least five times." May described the kicks as "full extended kick[s]." May yelled at the man to stop, and was told, "[T]hat's my wife, she stole five beers from me." According to May, the couple appeared to be drunk.
Derwin Lewis, who was fourteen years old at the time of the incident, was also a guest at the hotel. He observed defendant and the victim arguing across the street from the hotel. He said defendant was "cussing at her" and then pushed her. The victim fell to the ground and defendant continued "cussing at her." Defendant accused the victim of taking his beer. Lewis stated that the victim was attempting to get up, but defendant held her down. He observed defendant kick the victim in the head anywhere between ten and twenty times. He went inside the hotel and asked Neal to call the police because a man was outside kicking his wife. Lewis described the kicks as "like direct blows."
On the way to Atlantic City Medical Center (ACMC), the victim became unresponsive and began to vomit. Dr. James Lowe, a neurosurgeon and a member of the staff of ACMC, received a telephone call during the early morning hours of July 25, 1998, asking him to report to ACMC. Upon his arrival, Dr. Lowe viewed a CAT scan performed shortly after the victim's arrival, showing a subdural hematoma so large it was compressing her brain and had shifted it from left to right. According to Dr. Lowe, the prognosis was "extremely dismal" with emergency surgery being the victim's only chance of survival. The surgery was performed. However, there was no neurological change and, a short time later, the victim was pronounced brain-dead. He said "the findings *5 on the CAT scan were undeniably ... that of an acute traumatic event, meaning minutes to hours prior to the time which the CAT scan was performed." He opined that the injury was consistent with a patient who had been kicked several times in the head area. After the family made its decision regarding organ donation and the cessation of life support, the victim died later that day.
Cape May County Medical Examiner Elliot Gross performed an autopsy on the victim. He concluded that the cause of death was cerebral compressing or pressure on the brain, as a result of acute, meaning very recent, subdural hemorrhage due to blunt force trauma caused by multiple blows to the head.
Defendant testified at trial. He stated that he was born in Paterson and had basically lived in Atlantic City since he was eight years old. Although he traveled, he always came back to Atlantic City and had lived there continuously for approximately six years prior to the incident. He said he returned to Atlantic City "trying to find [out] if [his] parents were still alive." He related that he was homeless and did what he "usually [did] when trouble [was] happening, [he] started drinking." He said the only time he abstained from drinking was when he was in jail after being arrested for "having open containers in public or panhandling."
According to defendant, homeless people gathered under the boardwalk and would drink there. That is how he met the victim. From the time they met, defendant and the victim were constant companions. They would "be together practically day and night all the time." According to defendant, he and the victim were such severe alcoholics that they would wake up shaking because they needed a drink. Before he went to sleep, he made sure he had a bottle of wine for himself and a bottle of vodka for the victim, "and some forty ounces of beer that [they] would hide so when [they] woke up early before the liquor stores would open ... [they'd] have [their] morning drink." Defendant admitted that he and the victim had arguments and that he had slapped her on occasion.
Defendant stated that a few days before the incident the victim's daughter had wired her $250. They used the money, as well as money defendant had from panhandling, to rent a room at the Flamingo and buy alcohol. They checked into the Flamingo on July 22nd. He remembered that either the police or the manager of the Flamingo ordered them to leave on July 24th. They left between 12:00 p.m. and 2:00 p.m., and he had no memory of what transpired thereafter, until approximately 9:00 or 9:30 that evening. He remembered putting his hand in his pocket to find money to purchase alcohol and realized he still had the motel room key in his pocket. He asked the victim if she wanted to get something to drink and sneak back into the room. He did not remember if they followed through on that plan, and had no memory of an encounter with the police at the Flamingo, but he did remember buying more forty-ounce bottles of beer, some wine, vodka, and cigarettes at the liquor store.
After buying more alcohol, defendant testified he and the victim began walking toward the boardwalk, but after a while the victim sat down, and they began to argue because she wanted to start drinking immediately. He wanted to wait until they got under the boardwalk so they would not be observed on the street with open containers. He said they "ended up wrestling and hollering at each other," and he believed he slapped her. He did not remember kicking her. He remembered beginning to walk away with the alcohol, but when the victim did not follow, he went *6 back and argued with her again, and he believed he hit her. He recalled that during their struggle, the victim fell against a white truck, landing on her back. When asked if he disputed the witnesses' testimony that he kicked the victim, he said, "I'm not calling nobody a liar. I don't know what happened." He recalled being taken away by the police and waking up the next day in jail and asking a guard why he was there. Finally, defendant said that during the two and one-half days leading up to the victim's death, he drank more than he would usually drink because they had more money.
On this appeal, defendant raises the following arguments:
POINT I
THE STATE'S EXPERT WITNESS FLAGRANTLY VIOLATED THIS COURT'S RULING IN STATE V. PASTERICK, 285 N.J.Super. 607, 667 A.2d 1103 (App.Div.1995), WHEN HE TESTIFIED TO INADMISSIBLE HEARSAY AND OFFERED OPINIONS AS TO THE CREDIBILITY AND MORAL CHARACTER OF THE DEFENDANT (Not Raised Below).
POINT II
THE POLICE OFFICER'S TESTIMONY THAT HIS ENCOUNTER WITH THE DEFENDANT AND THE VICTIM AT A DIFFERENT MOTEL 30 MINUTES PRIOR TO HER DEATH WAS PROMPTED BY A DISPATCH CONCERNING "A MALE BEATING A FEMALE" WAS A VIOLATION OF DEFENDANT'S SIXTH AMENDMENT RIGHT TO CONFRONTATION, THE HEARSAY PROHIBITION OF THE EVIDENCE RULES AND STATE V. BANKSTON (Not Raised Below).
POINT III
THE JURY INSTRUCTION ON INTOXICATION SHOULD NOT HAVE TOLD JURORS THAT THE STATE'S BURDEN OF DISPROVING INTOXICATION ARISES ONLY "ONCE THE DEFENDANT PRODUCES SOME EVIDENCE OF HIS INTOXICATION." (Not Raised Below).
POINT IV

STATE V. MANZIE REQUIRES VACATION OF THE 85% PAROLE BAR.
We first consider defendant's contention that the State's expert, Dr. Michael Welner, without objection, in the course of his testimony offered inadmissible hearsay, as well as opinions regarding the credibility and moral character of defendant. Because defendant's trial attorney failed to object, we must analyze the claim in the context of R. 2:10-2, the plain error rule. Thus, we may only reverse if we are satisfied that the claimed error "is of such a nature as to have been clearly capable of producing an unjust result." R. 2:10-2; see also State v. Macon, 57 N.J. 325, 335, 273 A.2d 1 (1971) ("[T]he question whether an error is reason for reversal depends ... upon some degree of possibility that it led to an unjust verdict."). It is not enough that the claimed error may have led the jury to reach an alternate result. Rather, "[t]he possibility must be real, one sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached." Macon, supra, 57 N.J. at 336, 273 A.2d 1.
At trial, defendant contended that the fatal injuries could have been sustained when the victim's head hit the truck. However, the main thrust of his defense was that he was so intoxicated that he was incapable of acting purposely or knowingly. Intoxication is not a defense unless it negates an element of the offense. N.J.S.A. 2C:2-8(a); State v. Warren, 104 N.J. 571, 577, 518 A.2d 218 (1986); State v. *7 Cameron, 104 N.J. 42, 45, 51, 514 A.2d 1302 (1986). However, if recklessness establishes an element of the offense, even though due to self-induced intoxication, "such unawareness is immaterial," regardless that the actor is unaware of a risk of which he would have been aware had he been sober. N.J.S.A. 2C:2-8(b); Warren, supra, 104 N.J. at 577, 518 A.2d 218; Cameron, supra, 104 N.J. at 53, 514 A.2d 1302. Consequently, a person who is voluntarily intoxicated may still be found guilty of aggravated manslaughter or manslaughter, notwithstanding he was unaware of a risk of causing death and would have been aware of that risk had he been sober. Warren, supra, 104 N.J. at 577, 518 A.2d 218 (citing N.J.S.A. 2C:2-8).
A person is guilty of aggravated manslaughter if he "recklessly causes death under circumstances manifesting extreme indifference to human life," N.J.S.A. 2C:11-4(a)(1), and is guilty of manslaughter if he recklessly causes death, N.J.S.A. 2C:11-4(b)(1). However, the degree of intoxication sufficient to negate an element of an offense "must be of an extremely high level." Cameron, supra, 104 N.J. at 54, 514 A.2d 1302. In order to qualify as a defense to a crime involving a purposeful or knowing state of mind, the term "`intoxication' contemplates a condition by which the mental or physical capacities of the actor, because of the introduction of intoxicating substances into the body, are so prostrated as to render him incapable of purposeful or knowing conduct." Id. at 58, 514 A.2d 1302.
In support of his contention that he was intoxicated to such a degree as to raise a reasonable doubt as to whether he was capable of acting purposely or knowingly, defendant offered the testimony of Dr. Gary Glass, a forensic psychiatrist. Glass opined that on the date of the victim's death, defendant was so overwhelmed by his alcohol intoxication that he was incapable of forming the intent to kill or to cause serious bodily injury. He further stated that defendant suffered from long-standing and severe alcohol abuse and related medical problems.
During the discovery phase, Glass had been supplied with the report of the State's expert, Dr. Michael Welner. The defense, in anticipating Welner's testimony, elicited from Glass his disagreement with Welner's conclusions. Indeed, Glass engaged in a critique of many of Welner's conclusions and the basis for those conclusions. In addition, he testified that he did not agree with Welner's diagnosis of defendant as having an antisocial personality disorder and suggested that such a diagnosis could not be made because of defendant's alcohol dependency.
Welner testified on rebuttal in an effort to discredit Glass's opinion that defendant "was so overwhelmed by his alcohol intoxication" on the night of the victim's death that he was incapable of acting purposely or knowingly. When asked whether "there was a diagnosis that could be made regarding [defendant's] psychiatric state" on July 24, 1998, Welner offered two diagnoses: alcohol intoxication and antisocial personality disorder. In support of his conclusion that defendant suffered from antisocial personality disorder, Welner opined that defendant's personality conformed with the criteria that are characteristic of one who suffers from that disorder. He said those criteria are the
failure to conform to social norms with respect to lawful behaviors by doing things repeatedly that would result in arrest. Basically doing a lot of illegal things, one. Lying, two. Impulsivity or just doing things without looking forward to the consequences, three. Irritability and aggressiveness, four. Reckless disregard of one's own safety or the *8 safety of others, five. Consistent irresponsibility, irresponsibility about a job, irresponsibility about money, irresponsibility about parental obligations. And a lack of remorse, seven, either by being indifferent to the hurt or pain that you cause others or just rationalizing and making excuses.
Welner went on to relate that defendant had told him that although he had been drafted, he met up with an exotic dancer named Kim, took on her name, "and disappeared." Defendant told Welner that although Kim kept him financially comfortable, he was arrested for burglary and served several years in prison. According to Welner, defendant resumed his name after President Carter granted amnesty to those who evaded the draft. Welner then said defendant told him he left Kim and subsequently was arrested for stealing from a home and went to prison.
Welner further related that he interviewed people who had contact with defendant in Illinois, including Mr. Graziers. According to Welner, Graziers told him that when he met defendant in prison, defendant was "very expressive, very tearful, very remorseful, very sentimental, very devoted to Christianity, and seemed especially sincere." Apparently, Graziers was a member of a group that visited prisons to provide a "supportive kind of chaplain services." Welner mentioned a discussion he had with a person named Tom Jefferson who advised him that defendant went to a gas station and drove off without paying. According to Welner, "Jefferson had to go and make things right." Welner said he spoke to number of people who appeared to like defendant, but told him that whether defendant was drinking, he consistently lied to them and consistently broke rules. Welner also spoke to another person who said defendant stole a truck from him, but he would not file a criminal complaint.
In addition, Welner mentioned an interview he conducted with a person in Illinois who suffered from multiple sclerosis who explained to Welner that defendant had broken into his home and had stolen various items. Welner went on to say that a person with an antisocial personality "has a long standing history of being able to lie and to lie successfully." He said,
I felt that [defendant] sounded sincere all the time. I felt that if I was sitting there and if I would close my eyes and listen to him, or even just open my eyes and listen to him, that I would have found him utterly believable. If I would have sat with [defendant] and he would have been my entire source of information he would leave me with the impression that everything happened exactly as it did.
Thus, Welner told the jury, in effect, that defendant was a liar, implicitly suggesting to the jury that it should not be deluded by defendant's apparent sincerity. We are extremely troubled by the details regarding defendant's character provided by Welner, many of which were not proven and depended upon hearsay suggesting that defendant was, in essence, a bad person not worthy of belief.
If the facts or data relied upon by an expert in formulating an opinion are "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence." N.J.R.E. 703. Thus, hearsay statements upon which an expert relies are ordinarily admissible provided they are of a type reasonably relied upon by experts in the field. State v. Pasterick, 285 N.J.Super. 607, 620-21, 667 A.2d 1103 (App.Div.1995). However, hearsay is not admissible substantively as establishing *9 the truth of the statement. State v. Farthing, 331 N.J.Super. 58, 77, 751 A.2d 123 (App.Div.2000), certif. denied, 165 N.J. 530, 760 A.2d 784 (2000). Rather, it is admissible for the limited purpose of apprising the jury of the basis of the opinion. Ibid.
Consequently, if the expert relied upon the hearsay statement in formulating his or her opinion, the judge must advise the jury that it "should not consider the hearsay statement as substantive evidence relating to the question of guilt or innocence of the accused, but only as evidence tending to support the ultimate expert conclusion of the [witness]." Id. at 78, 751 A.2d 123. Moreover, the value or weight of the expert opinion is dependent upon, and no stronger than, the facts upon which it is based. Johnson v. Salem Corp., 97 N.J. 78, 91, 477 A.2d 1246 (1984); Polyard v. Terry, 160 N.J.Super. 497, 511, 390 A.2d 653 (App.Div.1978), aff'd, 79 N.J. 547, 401 A.2d 532 (1979). Therefore, if it appears that the expert relied upon the truth of the matter asserted in formulating an opinion, rather than the fact that the statement was made, the jury should be instructed that the probative value of the opinion is dependent upon, and no stronger than, those facts.
Conversely, if the expert did not rely upon the hearsay in formulating the opinion, the cross-examiner may not delve into the hearsay, even though it may be contained in the expert's report. Farthing, supra, 331 N.J.Super. at 79, 751 A.2d 123; State v. Spencer, 319 N.J.Super. 284, 299-303, 725 A.2d 106 (App.Div.1999). Simply put, "[e]xpert testimony is not a vehicle for the `wholesale [introduction] of otherwise inadmissible evidence.'" Farthing, supra, 331 N.J.Super. at 79, 751 A.2d 123 (citation omitted).
We recognize that in the course of his charge to the jury, the judge specifically stated:
[Y]ou've heard during the course of this trial about certain prior bad acts allegedly committed by the defendant which were testified to by Dr. Welner during the course of his testimony. These instances of alleged improper conduct were used for the sole purpose of establishing the State's psychiatric diagnosis and conclusions and are before you for the purpose of evaluating that and for the purpose____for you to understand a portion of the foundation of the opinions which he reached.
They're not to be used by you to infer that on the night in question that the defendant acted in conformance with those prior acts mentioned, that he's a bad person, or that because of those prior acts he committed the offense here charged. That limited and sole purpose is with respect to the foundation of certain conclusions drawn by the psychiatrist with respect to a psychiatric diagnosis.
The judge's instruction was correct. Nevertheless, we are extremely troubled by the extent of the hearsay that got before the jury even though it had not been admitted substantively. Indeed, the State made no effort to introduce substantively much of the hearsay relied upon by Welner. Defendant's attorney should have objected and, in the absence of an objection from counsel, the judge should have asked for an offer of proof on his own motion or excluded the hearsay. Pasterick, supra, 285 N.J.Super. at 620, 667 A.2d 1103. Moreover, Welner's opinion that defendant was an effective liar should never have been admitted. It is within the sole and exclusive province of the jury to determine the credibility of the testimony of a witness. We do not allow one witness to *10 comment upon the veracity of another witness. See, e.g., ibid.
As previously noted, we recognize that an expert who relies on hearsay as the basis of his opinion may relate that hearsay if it is of a type generally used by experts in the field. However, the jury must also be told that the value of the expert's opinion depends upon the facts upon which it is based. In addition, the admission of hearsay evidence in a criminal proceeding against a defendant necessarily implicates his or her constitutionally guaranteed right of confrontation.
Consequently, in its gatekeeping function, the trial court must be extremely vigilant in controlling the proceedings to assure that defendant's conviction is not caused by inadmissible hearsay that was never proven substantively. Thus, we suggest that both counsel and the court must be extremely sensitive in this area. The proponent should not elicit hearsay evidence that he or she is not prepared to prove substantively. After all, if the facts are not proven substantively, the weight of the expert's opinion should be diminished. Therefore, the judge should consider excluding the evidence under N.J.R.E. 403 because, in the absence of substantive proof, its probative value is substantially diminished by the risk of undue prejudice given the constitutional implications. Once the jury has heard the hearsay, it is very difficult to unring the bell with a cautionary instruction that the weight of the expert's opinion is dependent upon the facts upon which it is based.
We next consider the State's contention that Glass's extensive, critical references to Welner's conclusions opened the door, allowing Welner to testify in rebuttal regarding his conclusions and place the evidence in its proper context. To be sure, our Supreme Court has recognized the "opening the door" doctrine, stating that it "is essentially a rule of expanded relevancy and authorizes admitting evidence which otherwise would have been irrelevant or inadmissible." State v. James, 144 N.J. 538, 554, 677 A.2d 734 (1996). The evidence was offered in order to rebut evidence that was admitted and generated an issue, or inadmissible evidence that was admitted by the court over objection. Ibid. However, the doctrine is always subject to N.J.R.E. 403. Ibid. Thus, the evidence may still be excluded if it is determined "that the probative value of the otherwise inadmissible responsive evidence `is substantially outweighed by the risk of... undue prejudice, confusion of issues, or misleading the jury....'" Ibid. (quoting N.J.R.E. 403).
Here, even though the evidence may have been relevant to rebut Glass's contention that defendant did not suffer from antisocial personality disorder, it should, nevertheless, have been excluded under N.J.R.E. 403, particularly taking into account the amount of hearsay that was allowed. Moreover, as we shall next explain, we seriously question whether Welner's conclusion that defendant suffered from antisocial personality disorder was admissible.
Defendant offered the expert opinion of Glass to support his contention that his mental faculties were so prostrated by the ingestion of alcohol that he was incapable of forming a purposeful or knowing state of mind. "Intoxication does not, in itself, constitute mental disease" entitling a defendant to raise the defenses of insanity or diminished capacity. N.J.S.A. 2C:2-8(c). Because defendant did not offer Glass to give an opinion that he was suffering from a mental disease or defect, Welner's opinion that defendant suffered from antisocial personality disorder was irrelevant or, at the most, was of only minimal relevance. See Pasterick, supra, 285 N.J.Super. at 621, 667 A.2d 1103.
*11 We recognize that Welner's opinion was offered to rebut Glass's criticism of his opinion, as well as to support his conclusion that defendant's faculties were not prostrated by the ingestion of alcohol so as to render him incapable of acting purposely or knowingly. Nevertheless, the description of the disorder, coupled with the expert's opinion and his recitation of hearsay that was not substantively admitted, was extremely prejudicial to defendant. Thus, on remand, preliminarily, the judge must conduct a hearing pursuant to N.J.R.E. 104(a) to determine the admissibility of Welner's conclusion that defendant suffered from antisocial personality disorder. At that hearing, the judge must also determine whether, even though the evidence may be admissible, it should be excluded under N.J.R.E. 403 or, at the very least, sanitized. For example, in order to dispel a notion that Welner was arbitrarily rejecting Glass's opinion, it might have been sufficient for Welner to note his opinion that defendant suffered from a personality disorder that may have affected his actions. Simply put, a reasonable accommodation can be made to enable the State to rebut Glass's opinion without getting before the jury irrelevant hearsay simply because it was relied upon by an expert.
In light of our decision to reverse and remand, we need not consider defendant's additional contention that the judge erred in allowing McGee to testify that he was dispatched earlier in the evening to the Flamingo because of a report of a male beating a female. Nevertheless, for the sake of completeness, as well as for guidance for the parties on remand, we consider the contention. It is well-settled that a police officer may, without violating either the hearsay rule or defendant's right of confrontation, explain the reasons he either apprehended a suspect or went to the scene of the crime by stating that he did so "upon information received." State v. Bankston, 63 N.J. 263, 268, 307 A.2d 65 (1973) (citation omitted). The testimony is admissible to dispel any notion that the officer may have been acting arbitrarily or in order to explain his subsequent conduct. Ibid.
However, if "the officer becomes more specific by repeating what some other person told him concerning a crime by the accused the testimony violates the hearsay rule." Ibid. In addition, if "the logical implication to be drawn from the testimony leads the jury to believe that a non-testifying witness has given the police evidence of the accused's guilt, the testimony should be disallowed as hearsay." Id. at 271, 307 A.2d 65. On this appeal, the State suggests that the evidence was admissible to explain the motives of the police in approaching the couple at the Flamingo and, in addition, because it was not being offered for the truth of the matter asserted given that when the officers approached defendant and the victim, they saw no evidence confirming that a man had been beating a woman. We reject those suggestions. Simply put, the evidence suggested that a mere half hour earlier, defendant had been observed by non-testifying witnesses beating the victim. On remand, while the State may elicit evidence that the police went to the Flamingo based upon information received, it may not introduce evidence that the reason for the dispatch was a report of a man beating a woman.
Finally, although our reversal of defendant's conviction obviates the need to decide whether NERA applies to a conviction for murder, we note our basic agreement with defendant's position. We have previously held that NERA does not apply to murder. State v. Manzie, 335 N.J.Super. 267, 278, 762 A.2d 276 (2000). An equally divided Supreme Court affirmed. State v. Manzie, 168 N.J. 113, 773 A.2d 659 (2001). *12 While the Supreme Court affirmance in Manzie by an equally divided court may not constitute binding precedent, we decline the State's invitation to revisit the issue. See State v. Andino, 345 N.J.Super. 35, 38-40, 783 A.2d 267 (App.Div.2001) (declining to revisit Manzie particularly because, following the enactment of a new statute specifically quantifying a life sentence for purposes of NERA and making clear its application to murder convictions, the Supreme Court denied reconsideration of Manzie); see also State v. Allen, 337 N.J.Super. 259, 271-75, 766 A.2d 1168 (App.Div.2001), certif. denied, 171 N.J. 43, 791 A.2d 221 (2002).
Reversed and remanded for further proceedings consistent with this opinion.
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L. Ed.2d 694 (1966).